## HARMAN ET AL. v. FORSSENIUS ET AL.

No. 360.   Argued March 1–2, 1965.—Decided April 27, 1965.

*Joseph C. Carter, Jr.,* argued the cause for appellants. With him on the briefs were *Robert Y. Button,* Attorney General of Virginia, *Richard N. Harris,* Assistant Attorney General, and *E. Milton Farley III.*

*H. E. Widener, Jr.,* argued the cause for appellees. With him on the brief were *L. S. Parsons, Jr., John N. Dalton* and *Bentley Hite.*

*Harold H. Greene,* by special leave of Court, argued the cause for the United States, as *amicus curiae,* urging affirmance. With him on the brief were *Solicitor General Cox, Assistant Attorney General Marshall, Louis F. Claiborne* and *David Rubin.*

MR. CHIEF JUSTICE WARREN delivered the opinion of the Court.

We are called upon in this case to construe, for the first time, the Twenty-fourth Amendment to the Constitution of the United States:

> "The right of citizens of the United States to vote in any primary or other election for President or Vice President, for electors for President or Vice President, or for Senator or Representative in Congress, shall not be denied or abridged by the United States or any State by reason of failure to pay any poll tax or other tax."

The precise issue is whether § 24–17.2 of the Virginia Code—which provides that in order to qualify to vote in federal elections one must either pay a poll tax or file a witnessed or notarized certificate of residence [1]—contravenes this command.

---

[1] Va. Code Ann. § 24–17.2 (1964 Supp.) provides:

"Proof of residence required; how furnished.—

"(a) No person shall be deemed to have the qualifications of residence required by § 18 of the Constitution of Virginia and §§ 24–17 and 24–17.1 in any calendar year subsequent to that in which he reg-

Prior to the adoption of the Twenty-fourth Amendment, the Virginia Constitution (Art. II, §§ 18–20) and statutes (Va. Code Ann. §§ 24–17, 24–67 (1950)) established uniform standards for qualification for voting in both federal and state elections. The requirements were: (1) United States citizenship; (2) a minimum age of twenty-one; (3) residence in the State for one year, in the city or county for six months, and in the voting precinct for thirty days; and (4) payment "at least six months prior to the election . . . to the proper officer all State

istered under either § 24–67 or § 24–67.1, and shall not be entitled to vote in any election held in this State during any such subsequent calendar year, unless he has offered proof of continuing residence by filing in person, or otherwise, a certificate of residence at the time and in the manner prescribed in paragraph (b) of this section, or, at his option, by personally paying to the proper officer, at least six months prior to any such election in which he offers to vote, all State poll taxes assessed or assessable against him for the three years next preceding that in which he offers to vote. Proof of continuing residence may only be established by either of such two methods.

"(b) Any person who shall offer proof of continuing residence by filing a certificate of residence as provided in paragraph (a) of this section, shall file with the treasurer of his county or city not earlier than the first of October of the year next preceding that in which he offers to vote and not later than six months prior to the election, a certificate in form substantially as follows:

"I do certify that I am now and have been a resident of Virginia since the date of my registration to vote under the laws of Virginia, that I am now a resident of . . . . . . . . . . . . . . . . . . . . (city or county), residing at . . . . . . . . . . . . . . . . . . . . . . . . . . . (street and number, or place of residence therein), and that it is my present intention not to remove from the city or county stated herein prior to the next general election.

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"Witnessed: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"or

"Subscribed and sworn to before me this . . . . . . . . . . . . . . . . . . . . . . . .
day of . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ., 19. . . . . . .

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
"Notary Public"

poll taxes [$1.50 annually] assessed or assessable against him for three years next preceding such election."[2] The statutes further provided for permanent registration.[3] Once registered, the voters could qualify for elections in subsequent years merely by paying the poll taxes.

In 1963, in anticipation of the promulgation of the Twenty-fourth Amendment, the Governor of Virginia convened a special session of the Virginia General Assembly. On November 21 of that year, the General Assembly enacted two Acts[4] designed

"(1) to enable persons to register and vote in Federal elections without the payment of poll tax or other tax as required by the 24th Amendment to the Constitution of the United States, (2) to continue in effect in all other elections the present registration and voting requirements of the Constitution of Virginia, and (3) to provide methods by which all persons registered to vote in Federal or other elections may prove that they meet the residence requirements of Section 18 of the Constitution of Virginia."[5]

No changes were made with regard to qualification for voting in state elections. With regard to federal elections, however, the payment of a poll tax as an absolute prerequisite to registration and voting was eliminated,

---

[2] Members of the Armed Services are exempt from the poll tax requirement. Va. Code Ann. § 24–23.1 (1950).

[3] Va. Code Ann. §§ 24–52—24–119 (1950). Registration, effected by filing an application showing that the statutory requirements had been met (§ 24–68), was permanent. Thereafter, in order to qualify for subsequent elections, the voter merely had to pay the assessed poll taxes (unless, of course, his name had been removed from the registration lists for, *inter alia,* failure to meet the statutory and constitutional requirements (§§ 24–94—24–96)).

[4] Va. Acts, 1963 Extra Sess., cc. 1 and 2. Chapter 2 is now codified in Title 24 of the Virginia Code. Chapter 1—applicable to 1964 elections only—has not been codified.

[5] Va. Acts, 1963 Extra Sess., c. 2, § 1 (a).

and a provision was added requiring the federal voter to file a certificate of residence in each election year or, at his option, to pay the customary poll taxes. The statute provides that the certificate of residence must be filed no earlier than October 1 of the year immediately preceding that in which the voter desires to vote and not later than six months prior to the election. The voter must state in the certificate (which must be notarized or witnessed) his present address, that he is currently a resident of Virginia, that he has been a resident since the date of his registration, and that he does not presently intend to remove from the city or county of which he is a resident prior to the next general election. Va. Code Ann. § 24–17.2 (1964 Supp.). Thus, as a result of the 1963 Acts, a citizen after registration may vote in both federal and state elections upon the payment of all assessable poll taxes. Va. Code Ann. § 24–17 (1964 Supp.). If he has not paid such taxes he cannot vote in state elections, and may vote in federal elections only upon filing a certificate of residence in each election year. Va. Code Ann. §§ 24–17.1, 24–17.2 (1964 Supp.).

The present appeal originated as two separate class actions, brought by appellees in the United States District Court for the Eastern District of Virginia, attacking the foregoing provisions of the 1963 Virginia legislation as violative of Art. I, § 2, of the Constitution of the United States, and the Fourteenth, Seventeenth, and Twenty-fourth Amendments thereto. The complaints, which prayed for declaratory and injunctive relief, named as defendants (appellants here) the three members of the Virginia State Board of Elections and, in one case, the County Treasurer of Roanoke County, Virginia, and, in the other, the Director of Finance of Fairfax County. The jurisdiction of the District Court was invoked pursuant to 28 U. S. C. §§ 1331, 1343, 2201 (1958 ed.), and

a court of three judges was convened pursuant to 28 U. S. C. §§ 2281, 2284 (1958 ed.).

The District Court denied the State's motion to stay the proceedings in order to give the Virginia courts an opportunity to resolve the issues and interpret the statutes involved. The court further denied the State's motions to dismiss for failure to join indispensable parties, for failure to state a claim on which relief could be granted, and for want of a justiciable controversy.[6]   On the merits, the District Court held that the certificate of residence requirement was "a distinct qualification" or at least an "increase [in] the quantum of necessary proof of residence" imposed solely on the federal voter, and that it therefore violated Art. I, § 2, and the Seventeenth Amendment, which provide that electors choosing a Representative or Senator in the Congress of the United States "shall have the qualifications requisite for electors of the most numerous branch of the State legislature." The court rejected the argument that the residency certificate was merely a method, like the poll tax, of proving the residence qualification which is imposed on both federal and state voters.   Accordingly, the District Court entered an order declaring invalid the portions of the 1963 Virginia legislation which required the filing of a certificate of residence and enjoining appellants from requiring compliance by a voter with said portions of the 1963 Acts.   We noted probable jurisdiction.   379 U. S. 810.

We hold that § 24–17.2 is repugnant to the Twenty-fourth Amendment and affirm the decision of the District

---

[6] The motion to dismiss for failure to state a claim on which relief could be granted and for failure to set forth a justiciable controversy was directed solely at the complaint of appellee Henderson, who was registered and had already paid his poll tax. The District Court was patently correct in rejecting the State's argument that appellee Henderson lacked standing to maintain this action. *Gray* v. *Sanders,* 372 U. S. 368, 374–376; *Baker* v. *Carr,* 369 U. S. 186, 204–208.

Court on that basis. We therefore find it unnecessary to determine whether that section violates Art. I, § 2, and the Seventeenth Amendment.

## I.

At the outset, we are faced with the State's contention that the District Court should have stayed the proceedings until the courts of Virginia had been afforded a reasonable opportunity to pass on underlying issues of state law and to construe the statutes involved. We hold that the District Court did not abuse its discretion in refusing to postpone the exercise of its jurisdiction.

In applying the doctrine of abstention, a federal district court is vested with discretion to decline to exercise or to postpone the exercise of its jurisdiction in deference to state court resolution of underlying issues of state law. *Railroad Comm'n* v. *Pullman Co.,* 312 U. S. 496.[7] Where resolution of the federal constitutional question is dependent upon, or may be materially altered by, the determination of an uncertain issue of state law, abstention may be proper in order to avoid unnecessary friction in federal-state relations, interference with important state functions, tentative decisions on questions of state law, and premature constitutional adjudication. *E. g., Railroad Comm'n* v. *Pullman Co.; supra.* The doctrine, however, contemplates that deference to state court adjudication only be made where the issue of state law is uncertain. *Davis* v. *Mann,* 377 U. S. 678, 690; *McNeese* v. *Board of Education,* 373 U. S. 668, 673–674; *Chicago* v. *Atchison, T. & S. F. R. Co.,* 357 U. S. 77, 84.[8] If the state statute

---

[7] See *Hostetter* v. *Idlewild Bon Voyage Liquor Corp ,* 377 U. S. 324, 328–329; *Baggett* v. *Bullitt,* 377 U. S. 360, 375; *England* v. *Louisiana State Board of Medical Examiners,* 375 U. S. 411, 415–416.

[8] To the same effect, see *England* v. *Louisiana State Board of Medical Examiners,* 375 U. S. 411, 415–416; *United Gas Pipe Line Co.* v. *Ideal Cement Co.,* 369· U. S. 134, 135–136; *Spector Motor Service, Inc.* v. *McLaughlin,* 323 U. S. 101, 105.

in question, although never interpreted by a state tribunal, is not fairly subject to an interpretation which will render unnecessary or substantially modify the federal constitutional question, it is the duty of the federal court to exercise its properly invoked jurisdiction. *Baggett* v. *Bullitt*, 377 U. S. 360, 375–379. Thus, "recognition of the role of state courts as the final expositors of state law implies no disregard for the primacy of the federal judiciary in deciding questions of federal law." *England* v. *Louisiana State Board of Medical Examiners*, 375 U. S. 411, 415–416.

The state statutes involved here are clear and unambiguous in all material respects.[9] While the State suggests that the Virginia tribunals are "unquestionably far better equipped than the lower [federal] court to unravel the skeins of local law and administrative practices in which the Appellees' claims are entangled,"[10] the State

---

[9] The only ambiguity discussed in the briefs of the parties or developed during argument concerned the question whether § 24–17.2 required the voter to secure a prepared certificate of residence from local election officials or whether he could personally prepare one "in form substantially" as set forth in the statute. We do not regard this as a material ambiguity having any effect on the constitutional question and accept, for the purposes of this decision, the State's assertion that the voter may secure such a form from local election officials or prepare one according to the statutory description. *Infra*, p. 541.

[10] The State also argues that since the States are empowered by Art. I, § 2, Art. II, § 1, and the Seventeenth Amendment to create voter qualifications for federal elections, the question whether a state statutory enactment creates a voter qualification must initially be referred to the state tribunals. True, "[t]he States have long been held to have broad powers to determine the conditions under which the right of suffrage may be exercised." *Lassiter* v. *Northampton County Board of Elections*, 360 U. S. 45, 50; *Pope* v. *Williams*, 193 U. S. 621, 633; *Mason* v. *Missouri*, 179 U. S. 328, 335. The right to vote, however, is constitutionally protected, *Ex parte Yarbrough*, 110 U. S. 651, 663–665; *Smith* v. *Allwright*, 321 U. S. 649, 664; and the conditions imposed by the States upon that right must not contravene

does not point to any provision in the legislation which leaves "reasonable room for a construction by the Virginia courts which might avoid in whole or in part the necessity for federal constitutional adjudication, or at least materially change the nature of the problem." *Harrison v. NAACP*, 360 U. S. 167, 177.

In spite of the clarity of the 1963 legislation, the State argues that the District Court should have abstained on the ground that if the certificate of residence requirement were found to be a qualification distinct from those specified in the Virginia Constitution, it would be invalid as a matter of Virginia law and "a crucial federal constitutional issue would accordingly disappear from the case." We find little force in this argument. The section of the Virginia Constitution (Art. II, § 18) on which the State relies expressly limits the franchise to citizens who have met certain residency requirements.[11] The statute in issue, § 24–17.2, requires the voter to certify that he meets those residence requirements. It is thus difficult to envisage how § 24–17.2 could be construed as setting forth a qualification not found in the Virginia Constitution.[12]

---

any constitutional provision or congressional restriction enacted pursuant to constitutional power. *Carrington v. Rash, ante,* p. 89, 91; *Lassiter v. Northampton County Board of Elections,* 360 U. S. 45, 50–51; *United States v. Classic,* 313 U. S. 299, 315. The question presented in this case—whether the Virginia statute imposes a condition upon the franchise which violates the United States Constitution—is thus quite clearly a federal question. The precise nature of the condition imposed is, of course, a question of Virginia law. However, the statutory requirement is clear and unambiguous, and the sole question remaining is whether the state requirement is valid under the Federal Constitution.

[11] Va. Const., Art. II, § 18, sets forth as a qualification for voting: residency in the State for one year, in the city or county six months, and in the voting precinct thirty days.

[12] Moreover, the State cites no Virginia decisions in support of its contention that the requirement might constitute an impermissible "qualification" according to Virginia law.

In addition to the clarity of the Virginia statutes, support for the District Court's refusal to stay the proceedings is found in the nature of the constitutional deprivation alleged and the probable consequences of abstaining. *Griffin* v. *County School Board of Prince Edward County,* 377 U. S. 218, 229; *Baggett* v. *Bullitt,* 377 U. S. 360, 375–379. The District Court was faced with two class actions attacking a statutory scheme allegedly impairing the right to vote in violation of Art. I, § 2, and the Fourteenth, Seventeenth and Twenty-fourth Amendments. As this Court has stressed on numerous occasions, "[t]he right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds* v. *Sims,* 377 U. S. 533, 555. The right is fundamental "because preservative of all rights." *Yick Wo* v. *Hopkins,* 118 U. S. 356, 370. In appraising the motion to stay proceedings, the District Court was thus faced with a claimed impairment of the fundamental civil rights of a broad class of citizens. The motion was heard about two months prior to the deadline for meeting the statutory requirements and just eight months before the 1964 general elections. Given the importance and immediacy of the problem, and the delay inherent in referring questions of state law to state tribunals,[13] it is evident that the District Court did not abuse its discretion in refusing to abstain. *Griffin* v. *County School Board of Prince Edward County,* 377 U. S. 218, 229; *Baggett* v. *Bullitt,* 377 U. S. 360, 375–379.[14]

---

[13] See *Baggett* v. *Bullitt,* 377 U. S. 360, 378–379; *England* v. *Louisiana State Board of Medical Examiners,* 375 U. S. 411, 425–426 (DOUGLAS, J., concurring).

[14] The State also asserts that the District Court erred in denying its motion to dismiss for failure to join indispensable parties. The argument is that the relief requested in the complaints was an injunction against the enforcement of all provisions of the 1963 legis-

## II.

Reaching the merits, it is important to emphasize that the question presented is not whether it would be within a State's power to abolish entirely the poll tax and require all voters—state and federal—to file annually a certificate of residence. Rather, the issue here is whether the State of Virginia may constitutionally confront the federal voter with a requirement that he *either* pay the customary poll taxes as required for state elections *or* file a certificate of residence. We conclude that this requirement constitutes an abridgment of the right to vote in federal elections in contravention of the Twenty-fourth Amendment.

Prior to the proposal of the Twenty-fourth Amendment in 1962, federal legislation to eliminate poll taxes, either by constitutional amendment or statute, had been introduced in every Congress since 1939. The House of Representatives passed anti-poll tax bills on five occasions and

---

lation, which included a system for separate registration of state and federal voters. Va. Code Ann. §§ 24–67, 24–67.1 (1964 Supp.). Since registration in Virginia is entrusted to local registrars, the State argues, their joinder was essential in order to effect the relief requested. *Williams* v. *Fanning,* 332 U. S. 490, 493–494.

While the State is correct in asserting that the complaints were phrased broadly enough to encompass all portions of the 1963 Acts, the District Court was certainly warranted in concluding that the basic aim of the complaints was to secure relief from the certificate of residence requirement. The named defendants were clearly capable of effecting this relief and hence the District Court did not err in denying the motion to dismiss. *Ceballos* v. *Shaughnessy,* 352 U. S. 599, 603–604. Moreover, even accepting the State's broad construction of the complaints, it is apparent that, given the State Board of Elections' power to supervise and to insure "legality" in the election process (Va. Code Ann. §§ 24–25, 24–26, 24–27 (1950)), the local registrars were not indispensable parties. See *Louisiana* v. *United States, ante,* pp. 145, 151, n. 10.

the Senate twice proposed constitutional amendments.[15] Even though in 1962 only five States retained the poll tax as a voting requirement, Congress reflected widespread national concern with the characteristics of the tax. Disenchantment with the poll tax was many-faceted.[16] One of the basic objections to the poll tax was that it exacted a price for the privilege of exercising the franchise. Congressional hearings and debates indicate a general repugnance to the disenfranchisement of the poor occasioned by failure to pay the tax.[17]

> "While it is true that the amount of poll tax now required to be paid in the several States is small and imposes only a slight economical obstacle for any citizen who desires to qualify in order to vote, nevertheless, it is significant that the voting in poll tax States is relatively low as compared to the overall population which would be eligible. . . . [T]he historical analysis . . . indicates that where the poll tax has been abandoned . . . voter participation increased." H. R. Rep. No. 1821, 87th Cong., 2d Sess., p. 3.

Another objection to the poll tax raised in the congressional hearings was that the tax usually had to be paid long before the election—at a time when political campaigns were still quiescent—which tended to eliminate from the franchise a substantial number of voters who did

---

[15] H. R. Rep. No. 1821, 87th Cong., 2d Sess., p. 2.

[16] See generally Ogden, The Poll Tax in the South (1958).

[17] See, *e. g.*, Hearings before Subcommittee No. 5 of the House Committee on the Judiciary on Amendments to Abolish Tax and Property Qualifications for Electors in Federal Elections, 87th Cong., 2d Sess., 14–22, 48–58 (hereinafter cited as House Hearings); Hearings before a Subcommittee of the Senate Committee on the Judiciary on S. J. Res. 29, 87th Cong., 2d Sess., 33 (hereinafter cited as Senate Hearings).

not plan so far ahead.[18]   The poll tax was also attacked as a vehicle for fraud which could be manipulated by political machines by financing block payments of the tax.[19]   In addition, and of primary concern to many, the poll tax was viewed as a requirement adopted with an eye to the disenfranchisement of Negroes and applied in a discriminatory manner.[20]   It is against this background that Congress proposed, and three-fourths of the States ratified, the Twenty-fourth Amendment abolishing the poll tax as a requirement for voting in federal elections.

Upon adoption of the Amendment, of course, no State could condition the federal franchise upon payment of a poll tax.   The State of Virginia accordingly removed the poll tax as an absolute prerequisite to qualification for voting in federal elections, but in its stead substituted a provision whereby the federal voter could qualify either by paying the customary poll tax or by filing a certificate of residence six months before the election.

It has long been established that a State may not impose a penalty upon those who exercise a right guaranteed by the Constitution.   *Frost & Frost Trucking Co.* v. *Railroad Comm'n of California,* 271 U. S. 583.   "Constitutional rights would be of little value if they could be . . . indirectly denied," *Smith* v. *Allwright,* 321 U. S. 649, 664, or "manipulated out of existence." *Gomillion* v. *Lightfoot,* 364 U. S. 339, 345.   Significantly, the Twenty-fourth Amendment does not merely insure that the franchise shall not be "denied" by reason of failure to pay the poll tax; it expressly guarantees that the right to vote shall not be "denied or abridged" for that reason.   Thus, like the Fifteenth Amendment, the Twenty-fourth "nullifies sophisticated as well as simple-minded modes" of im-

---

[18] See, *e. g.,* House Hearings 14–15.  See generally Ogden, *supra,* note 16, at 44–52.

[19] See Ogden, *supra,* note 16, at 59–110.

[20] See House Hearings 14–22, 26–27, 48–58; Senate Hearings 33.

pairing the right guaranteed. *Lane* v. *Wilson,* 307 U. S. 268, 275. "It hits onerous procedural requirements which effectively handicap exercise of the franchise" by those claiming the constitutional immunity. *Ibid.;* cf. *Gray* v. *Johnson,* 234 F. Supp. 743 (D. C. S. D. Miss.).

Thus, in order to demonstrate the invalidity of § 24–17.2 of the Virginia Code, it need only be shown that it imposes a material requirement solely upon those who refuse to surrender their constitutional right to vote in federal elections without paying a poll tax. Section 24–17.2 unquestionably erects a real obstacle to voting in federal elections for those who assert their constitutional exemption from the poll tax. As previously indicated, the requirement for those who wish to participate in federal elections without paying the poll tax is that they file in each election year, within a stated interval ending six months before the election, a notarized or witnessed certificate attesting that they have been continuous residents of the State since the date of registration (which might have been many years before under Virginia's system of permanent registration) and that they do not presently intend to leave the city or county in which they reside prior to the forthcoming election. Unlike the poll tax bill which is sent to the voter's residence, it is not entirely clear how one obtains the necessary certificate. The statutes merely provide for the distribution of the forms to city and county court clerks, and for further distribution to local registrars and election officials. Va. Code Ann. § 24–28.1 (1964 Supp.). Construing the statutes in the manner least burdensome to the voter, it would seem that the voter could either obtain the certificate of residence from local election officials or prepare personally "a certificate in form substantially" as set forth in the statute. The certificate must then be filed "in person, or otherwise" with the city or county treasurer. This is plainly a cumbersome pro-

cedure. In effect, it amounts to annual re-registration which Virginia officials have sharply contrasted with the "simple" poll tax system.[21] For many, it would probably seem far preferable to mail in the poll tax payment upon receipt of the bill. In addition, the certificate must be filed six months before the election, thus perpetuating one of the disenfranchising characteristics of the poll tax which the Twenty-fourth Amendment was designed to eliminate. We are thus constrained to hold that the requirement imposed upon the voter who refuses to pay the poll tax constitutes an abridgment of his right to vote by reason of failure to pay the poll tax.

The requirement imposed upon those who reject the poll tax method of qualifying would not be saved even if it could be said that it is no more onerous, or even somewhat less onerous, than the poll tax. For federal elections, the poll tax is abolished absolutely as a prerequisite to voting, and no equivalent or milder substitute may be imposed. Any material requirement imposed upon the federal voter solely because of his refusal to waive the constitutional immunity subverts the effectiveness of the Twenty-fourth Amendment and must fall under its ban.

Nor may the statutory scheme be saved, as the State asserts, on the ground that the certificate is a necessary substitute method of proving residence, serving the same function as the poll tax. As this Court has held in analogous situations, constitutional deprivations may not be justified by some remote administrative benefit to the State. *Carrington* v. *Rash, ante,* pp. 89, 96; *Oyama*

---

[21] See, *e. g.,* the testimony of Judge William Old before the House Judiciary Committee, defending the poll tax as enabling Virginia "to avoid the burdensome necessity for annual registration." House Hearings 81. See also *id.,* at 98–99 (Attorney General Button); 108 Cong. Rec. 4532 (Senator Byrd); 108 Cong. Rec. 4641 (Senator Robertson); R. 73, 76 (Governor Harrison).

v. *California,* 332 U. S. 633, 646–647. Moreover, in this case the State has not demonstrated that the alternative requirement is in any sense necessary to the proper administration of its election laws. The forty-six States which do not require the payment of poll taxes have apparently found no great administrative burden in insuring that the electorate is limited to bona fide residents. The availability of numerous devices to enforce valid residence requirements—such as registration, use of the criminal sanction, purging of registration lists, challenges and oaths, public scrutiny by candidates and other interested parties—demonstrates quite clearly the lack of necessity for imposing a requirement whereby persons desiring to vote in federal elections must either pay a poll tax or file a certificate of residence six months prior to the election.

The Virginia poll tax was born of a desire to disenfranchise the Negro.[22] At the Virginia Constitutional Convention of 1902, the sponsor of the suffrage plan of which the poll tax was an integral part frankly expressed the purpose of the suffrage proposal:

> "Discrimination! Why, that is precisely what we propose; that, exactly, is what this Convention was elected for—to discriminate to the very extremity of permissible action under the limitations of the Federal Constitution, with a view to the elimination of every negro voter who can be gotten rid of, legally, without materially impairing the numerical strength of the white electorate." [23]

---

[22] See 2 Virginia Constitutional Convention (Proceedings and Debates, 1901–1902) 2937–3080.

[23] Statement of the Honorable Carter Glass, *id.,* at 3076–3077. This statement was characteristic of the entire debate on the suffrage issue; the only real controversy was whether the provisions eventually adopted were sufficient to accomplish the disenfranchisement of the Negro. See *id.,* at 2937–3080.

544

The poll tax was later characterized by the Virginia Supreme Court of Appeals as a device limiting "the right of suffrage to those who took sufficient interest in the affairs of the State to qualify themselves to vote." *Campbell* v. *Goode,* 172 Va. 463, 466, 2 S. E. 2d 456, 457. Whether, as the State contends, the payment of the poll tax is also a reliable indicium of continuing residence need not be decided, for even if the poll tax has served such an evidentiary function, the confrontation of the federal voter with a requirement that he either continue to pay the customary poll tax or file a certificate of residence could not be sustained. For federal elections the poll tax, regardless of the services it performs, was abolished by the Twenty-fourth Amendment. That Amendment was also designed to absolve all requirements impairing the right to vote in federal elections by reason of failure to pay the poll tax. Section 24–17.2 of the Virginia Code falls within this proscription.

The judgment of the District Court is

*Affirmed.*

MR. JUSTICE HARLAN agrees with this opinion insofar as it rests on the proposition that the Twenty-fourth Amendment forbids the use of a state poll tax for any purpose whatever in determining voter qualifications in all elections for federal office. He also agrees that this is not a case for application of the abstention doctrine.