HEALTH SYSTEMS AGENCY OF
NORTHERN VIRGINIA et
al., Plaintiffs,

v.

VIRGINIA STATE BOARD OF
MEDICINE et al., Defendants.

Civ. A. No. 76–37–A.

United States District Court,
E. D. Virginia,
Alexandria Division.

Nov. 4, 1976.

Lewis H. Goldfarb, Reston, Va., and Robert E. McGarrah, Jr., Washington, D.C., for plaintiffs.

Walter L. Penn, III, Asst. Atty. Gen., Richmond, Va. (Andrew P. Miller, Atty. Gen. of Virginia and D. Patrick Lacy, Jr., Asst. Atty. Gen., Richmond, Va., on brief), for defendants.

Before BUTZNER, Circuit Judge, and WARRINER and BRYAN, District Judges.

BUTZNER, Circuit Judge:

The principal issue in this case is whether the plaintiffs have a constitutional right to gather, publish, and receive information about the services and fees of physicians practicing in their community. The defendants assert that physicians who furnish information to be published in a medical directory, as proposed by the plaintiffs, would violate § 54–317(13) of the Virginia Code. This statute provides in part:

"Any practitioner of medicine . . . shall be considered guilty of unprofessional conduct if he:

.  .  .  .  .

(13) Advertises to the public directly or indirectly in any manner his professional services, their costs, prices, fees, credit terms or quality."

We hold that § 54–317(13) abridges the plaintiffs' first amendment rights,[1] and we enjoin the defendants from enforcing the statute against physicians furnishing information for the directory.

I

The facts have been stipulated by the parties. The plaintiff, Health Systems Agency of Northern Virginia, a nonprofit Virginia corporation, has been designated by the United States Department of Health, Education, and Welfare as the health planning agency for northern Virginia.[2] The Agency plans to publish a directory of factual information to help per-

---

1. The first amendment of the United States Constitution provides in part that "Congress shall make no law . . . abridging the freedom of speech, or of the press." The fourteenth amendment makes the first amendment applicable to the states. *Gitlow v. New York,* 268 U.S. 652, 666, 45 S.Ct. 625, 69 L.Ed. 1138 (1925).

2. The Agency, successor to the Comprehensive Health Planning Council of Northern Virginia, serves the counties of Arlington, Fairfax, Loudoun, and Prince William, and the cities of Alexandria, Fairfax, and Falls Church. *See* 42 U.S.C. § 300*l.*

sons select physicians. The kind of information to be included and the general format of the publication are illustrated by the following sample of a directory listing:[3]

DOE, JOHN

**Introductory Information:**
  101 First Avenue
  Medville, New York 10022
  212-111-2222
  Internist
  Fee-for-service, solo practice.
  Office personnel: one RN, one laboratory technician, one secretary.

**Education, Certification, Appointments:**
  Doctors Medical College, Centerville, N.Y.—1954.
  Internship: Good Hope Hospital, Centerville, N.Y.—1954-55.
  Residency: Vista General Hospital, Chester City, N.Y.—1956-59.
  Fellowship in Cardiology: Doctors Medical College, Chester City, N.Y.—1959-60.
  Subspecialty, cardiology. Board-certified in internal medicine.
  Chairman of Medical Education—Medville Hospital.
  Assistant Professor of Medicine—Westside Medical School.
  Chief, Department of Cardiology—Urban Medical Center, Chester City, N.Y.
  Admits patients to: Medville Hospital—accredited, voluntary, affiliated with Westside Medical School; Urban Medical Center—accredited, municipal, nurses' training program.

**Availability:**
  Sees patients by appointment; emergencies anytime, if available.
  Office hours: 8 A.M. to noon, Mon. to Thurs. and Sat.; 2 to 5 P.M., Wed.
  Phone consultation: during office hours and evenings; no fee.
  Answering service.

  After-hours coverage: usually available; if out of area, other doctors cover.
  Makes house calls. Standard fee: $00 day, $00 night.
  Accepts new patients.
  Usual advance notice for routine visit: 1-3 days; for complete physical examination: 3 months.
  Average waiting-room time: 30 minutes
  Languages: English, Spanish.

**Fees and Billing:**
  Standard fee for routine office visit: $00.
  Routine hospital visit: $00.
  Does not request fees before seeing the patient or at the time of service.
  Bills monthly.
  Itemizes bills
  Refers patient inquiries and complaints about billing to bookkeeper.
  Handles unpaid accounts by sending out reminder notices, then refers to collection agency.
  Accepts Medicaid patients.
  Sometimes accepts Medicare fee schedule as payment in full, depending on patient's economic status.

**Practice Information:**
  Office equipped for: Chest X-ray        Fee $00
                       Complete blood count    00
                       Electrocardiogram       00
                       Throat culture          00
                       Urinalysis              00
  Prescribes contraception upon request
  Routinely prescribes drugs by generic name
  Usually advises patients of possible drug side effects.
  Allows patients to view their medical records upon request

Another plaintiff, Virginia Citizens Consumer Council, is a nonprofit, nonpartisan, volunteer organization incorporated in Virginia. Its president, Helen Savage, who is also a plaintiff, and many of its members seek the services of doctors practicing in northern Virginia. Members of the Consumer Council wish to receive the proposed directory because they believe they would benefit from the information.

The defendants are the Virginia State Board of Medicine and its members. The Board is empowered, by § 54–316(3) of the Virginia Code, to discipline any physician "guilty of immoral conduct, or of unprofessional conduct as defined in § 54–317." Consequently, it can enforce the statute's prohibition against advertising by physicians.

3. The format for the directory listing was proposed in September, 1974, in *Consumer Reports*, a magazine published by Consumers Union.

4. The *American Medical Directory* is a national listing published in four volumes for $110.00 by the American Medical Association in Chicago,

The Agency investigated the information about physicians available from the telephone directory, the local medical societies, the *American Medical Directory*, the *Directory of Medical Specialists*, and the *Washington Physicians Directory*.[4] It found that a resident of northern Virginia cannot readily obtain any information other than the name, address, telephone number, and speciality of a physician. Professional directories, which include educational credentials, are generally unavailable to the public.

The Agency asked the Board whether physicians would violate § 54–317(13) if they supplied information for the directory. In its reply, the Board enclosed a copy of an opinion by the Attorney General of Virginia which stated:

Illinois. The *Directory of Medical Specialists* is a national listing published in two volumes by Marquis Who's Who in Chicago, Illinois. The *Washington Physicians Directory* is a Washington, D.C. metropolitan area listing published in one volume by National Directories, Inc.

"A physician may allow information to be published regarding his identification as a physician and his business location and telephone number. I am of the opinion, however, that a physician, who provides information regarding the costs, prices, fees, credit terms or quality of his professional services in order that they may be published in a Directory as proposed, would be in violation of the prohibition set forth in § 54–317(13)."

Because of this statutory prohibition, physicians will not furnish to the Agency for publication any information about their professional services, costs, prices, fees, and credit terms. Nevertheless, physicians may legally and ethically furnish the same information to prospective patients.

## II

The defendants suggest that this court should abstain from adjudicating the constitutionality of § 54–317(13) until Virginia courts determine that physicians furnishing information for publication in the directory would violate the statute. We conclude that abstention would be inappropriate.

The abstention doctrine is properly invoked when an ambiguous state law is subject to an interpretation which would avoid or substantially modify a federal constitutional question. *See Railroad Commission v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). If the state law is not subject to such an interpretation, it is the duty of the federal courts to accept jurisdiction even though the state law has never been interpreted by a state court. *Wisconsin v. Constantineau,* 400 U.S. 433, 439, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971); *Harman v. Forssenius,* 380 U.S. 528, 534–35, 85 S.Ct. 1177, 14 L.Ed.2d 50 (1965).

In this case, we need not await a decision by the state court. The parties have stipulated that the section "prohibits a practitioner of medicine or the healing arts from furnishing the information enumerated therein for publication in the Directory." Moreover, the Attorney General of Virginia has ruled that physicians who supply information for publication in the directory would violate the statute.

We agree with the stipulation of the parties and the ruling of the Attorney General. The mandate of the statute is clear. It specifically prohibits a physician from "advertising to the general public *directly or indirectly in any manner* his professional services, their costs, prices, fees, credit terms or quality" (emphasis supplied). Since the statute is not subject to an interpretation which would avoid or substantially modify a constitutional question, it is the duty of this court to accept jurisdiction.[5]

## III

The defendants insist that the plaintiffs lack standing to invoke the jurisdiction of the court. They argue that since § 54–317(13) prohibits physicians from advertising, only physicians have standing to challenge the constitutionality of the statute. In countering this argument, the plaintiffs deny that they are attempting to assert the rights of physicians. Rather, they contend that the statute infringes their own first amendment rights to gather, publish, and receive information about physicians' services.

Standing involves both constitutional limitations on federal jurisdiction and prudential limitations on its exercise. To establish the constitutional dimension, the plaintiffs must make out a "case or controversy" against their adversaries within the meaning of Article III. To demonstrate that this case is not barred by prudential considerations, they must show that their right of action rests on a constitutional or statutory basis. *Warth v. Seldin,* 422 U.S. 490, 498–501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Employing these tests, we hold that

---

**5.** Because of the language of the statute, the opinion of the Attorney General, and the stipulation of the parties, this case is distinguishable from *Public Citizen v. Commission on Medical Discipline,* Civil No. B–74–56 (D.Md., June 24, 1976), where, under significantly different circumstances, the court abstained to allow the state courts to decide whether publication of a directory of physicians' services is an advertisement prohibited by Maryland law.

the plaintiffs have alleged a first amendment interest sufficient to challenge the constitutionality of the statute.

■ The parties have stipulated that physicians will not furnish information for the directory because of the advertising ban; that the Agency cannot obtain this information from other sources; and that members of the Consumer Council will be denied this information unless they independently contact individual physicians. These stipulations clearly demonstrate that the plaintiffs have a personal stake sufficient to constitute a case or controversy under Article III. *See United States v. SCRAP*, 412 U.S. 669, 683–90, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

The prudential requirements for standing are also satisfied. The first amendment affords the plaintiffs a cause of action.

■ In *Lovell v. Griffin*, 303 U.S. 444, 452, 58 S.Ct. 666, 669, 82 L.Ed. 949 (1938), Mr. Chief Justice Hughes wrote:

"The liberty of the press is not confined to newspapers and periodicals. It necessarily embraces pamphlets and leaflets. . . . The press in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion."

The proposed directory contains information of interest to people who need physicians. The directory, therefore, is embraced by the term "press" as used in the first amendment.

Because the press includes the directory, the Agency's standing is premised on the first amendment right to gather and publish news. In *Branzburg v. Hayes*, 408 U.S. 665, 681, 92 S.Ct. 2646, 2656, 33 L.Ed.2d 626 (1972), the Court acknowledged that "without some protection for seeking out the news, freedom of the press could be eviscerated." Nevertheless, the right to gather information is not without restraints. *Zemel v. Rusk*, 381 U.S. 1, 17, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965). In delineating this right, the Court has stated: "It has gener-

ally been held that the First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally." *Branzburg*, 408 U.S. at 684, 92 S.Ct. at 2658. Conversely, the Court has indicated that the right of the press to gather news extends at a minimum to "access to sources of information available to members of the general public." *Pell v. Procunier*, 417 U.S. 817, 835, 94 S.Ct. 2800, 2810, 41 L.Ed.2d 495 (1974).

In this case, the Agency does not seek special access to information unavailable to the general public. It asks, instead, to gather and publish information which the defendants concede is available from physicians, albeit in bits and pieces, upon the request of prospective patients. There is no suggestion that physicians give this information in confidence. The recipient can freely disclose it whether or not he or she becomes an actual patient. Since § 54–317(13) prevents physicians from giving the same information to the Agency for publication, the Agency has standing to challenge the constitutionality of the statute.

The standing of Helen Savage and the Consumer Council is premised on the right to receive information about physicians' services. Their claim to standing is similar to that asserted by the plaintiffs in *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). There the Court allowed an individual purchaser of prescription drugs and two nonprofit organizations that were not composed of pharmacists to challenge the constitutionality of a Virginia statute that prohibited pharmacists from advertising the price of prescription drugs. The Court said: "If there is a right to advertise, there is a reciprocal right to receive the advertising, and it may be asserted by these [consumers]." 425 U.S. at 757, 96 S.Ct. at 1823; *accord, Kleindienst v. Mandel*, 408 U.S. 753, 762–63, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972); *Lamont v. Postmaster General*, 381 U.S. 301, 305, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965).

We hold, therefore, that all of the plaintiffs have established standing to challenge the constitutionality of the statute. We turn next to the merits of the case.

## IV

■ Two recent cases firmly establish that advertising is protected by the first amendment and that the interest served by an advertising ban must be balanced against the interest in freedom of expression. *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976); [6] *Bigelow v. Virginia,* 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975).[7] Several factors must be weighed in considering the constitutionality of § 54–317(13): (A) the feasibility of obtaining information about physicians from sources other than the directory; (B) the state's need to prevent unscrupulous physicians from publishing fraudulent or deceptive advertising; and (C) the state's interest in protecting people from unwittingly misusing even truthful information.[8] We will consider each of these elements separately.

### A

■ The Board argues that people do not need the directory because they can secure the same information from individual physicians. This alternative does not in itself extinguish the plaintiffs' first amendment rights, *Schneider v. State,* 308 U.S. 147, 163, 60 S.Ct. 146, 84 L.Ed. 155 (1939), but it must be considered in weighing these rights against the state's regulatory interest.

*Kleindeinst v. Mandel,* 408 U.S. 753, 765, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972).

The Supreme Court has observed that "in a society in which each individual has but limited time and resources . . . he relies necessarily upon the press to bring him in convenient form the facts." *Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 491, 95 S.Ct. 1029, 1044, 43 L.Ed.2d 328 (1975). Many people are likely to find it difficult to question individual physicians in order to choose those who will best satisfy their needs. Like advertisements of prescription drugs, published information on physicians' services "could mean the alleviation of physical pain or the enjoyment of basic necessities." *Virginia State Board of Pharmacy,* 425 U.S. at 764, 96 S.Ct. at 1827. We, therefore, find that questioning individual doctors does not present a satisfactory alternative, unless the directory would be deceptive or confusing to the public.

### B

■ Undoubtedly, the state has a substantial interest in preventing the fraudulent or deceptive practice of medicine. *See Virginia State Board of Pharmacy,* 425 U.S. at 773 n. 25, 96 S.Ct. 1817; *Barsky v. Board of Regents,* 347 U.S. 442, 451, 74 S.Ct. 650, 98 L.Ed. 829 (1954). Nevertheless, the state cannot achieve its goals by unnecessarily broad encroachments on first amendment rights. *Shelton v. Tucker,* 364 U.S. 479, 488, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960). Narrowly tailored statutes, rather than broadside bans on advertising, are sufficient to prevent fraud and deception. In-

---

6. In *Virginia State Board of Pharmacy,* the Court held that a statute which prohibited pharmacists from advertising the price of prescription drugs violated the first amendment.

7. In *Bigelow,* the Court reversed, on first amendment grounds, the conviction of a newspaper editor for violation of a statute prohibiting the sale or circulation of a publication which encourages the procurement of an abortion.

8. Statutes banning advertisements related to health care are not invalidated by the due proc-

ess clause of the fourteenth amendment. *Head v. New Mexico Board,* 374 U.S. 424, 83 S.Ct. 1759, 10 L.Ed.2d 983 (1963); *Williamson v. Lee Optical Co.,* 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955); *Semler v. Dental Examiners,* 294 U.S. 608, 55 S.Ct. 570, 79 L.Ed. 1086 (1935); *Ritholz v. Commissioner,* 184 Va. 339, 35 S.E.2d 210 (1945). The reasons for an advertising ban, however, may not be sufficient to sustain such statutes against challenges based on the first amendment. *See Virginia State Board of Pharmacy,* 425 U.S. at 770, 96 S.Ct. 1817.

deed, Virginia has already enacted legislation aimed at such tactics.[9]

■ Furthermore, since § 54–317(13) does not prevent physicians from giving prospective patients the same information it proscribes in advertisements, the section cannot be sustained on the basis that it is designed to prevent deceptive advertising. The protection of the public from fraud and deception must rest on other provisions in the statute. We, therefore, conclude that the state's interest in prohibiting false and deceptive advertising by physicians does not justify the broad restrictions that § 54–317(13) imposes. *Cf. Talley v. California,* 362 U.S. 60, 63–64, 80 S.Ct. 536, 4 L.Ed.2d 559 (1960).

### C

■ The defendants' opposition to the directory also rests on the premise that even truthful advertising by physicians could be confusing. They contend that information about costs is inherently misleading because of the variety of professional services performed by physicians. They also argue that people will select physicians purely on the basis of cost without considering the quality of professional care. These assertions are entitled to great weight in balancing the competing interests between freedom of the press and the state's regulation of the medical profession. *See Virginia State Board of Pharmacy,* 425 U.S. at 773, 96 S.Ct. 1817 (Burger, C. J., concurring).

■ The Agency, we believe, has taken adequate precautions to allay the concern that the Board expresses. The directory would contain factual information furnished by physicians. The Agency would neither recommend any physician nor include any promotional statements. All physicians practicing in the area would have the opportunity to be listed under the same format without charge. Included in the information about each physician would be his or her fees for house calls and for routine office and hospital visits. In addition, the introduction to the directory would explain that, although each physician has an established fee schedule for different kinds of visits, fees vary depending on such things as the time that the physician spends with the patient and the number of laboratory tests needed.[10]

The Agency's proposal reasonably protects the public from being misled by the directory. Indeed, it is quite similar to the position on advertising and solicitation stated by the Judicial Council of the American Medical Association. The Council does not proscribe advertising in reputable directories. It approves listing the type of practice, office hours, biographical data, and other useful and relevant information. It also allows the physician to publish "his charge for a standard office visit, or his fee

9. Section 54–317, Code of Virginia, Supp.1976, provides in part:

"Any practitioner of medicine . . . shall be considered guilty of unprofessional conduct if he:

.     .     .     .     .

(2) Engages in the practice of any of the healing arts under a false or assumed name, or impersonates another practitioner of a like, similar or different name; or

.     .     .     .     .

(4) Issues or publishes in any way whatsoever advertising or other matter in which grossly improbable or extravagant statements are made, or which have a tendency to deceive or defraud the public or to impose upon credulous, ignorant persons; or

(5) Causes the publication or circulation or broadcasting of any advertisement or statement in which he claims that he can cure or treat diseases, ailments or infirmities by any secret method, procedure, treatment or medicine, or in which he claims that a manifestly incurable disease or infirmity can be permanently cured; or

(6) Advertises or professes or holds himself out as being able and willing to treat human ailments under a system or school of practice other than that for which he holds a certificate or license granted by the Board; or

.     .     .     .     .

(14) Performs any dishonorable, unethical, unprofessional or unconscionable conduct likely to deceive, defraud or harm the public; . . ."

10. References to fees in the introduction are quoted in Appendix A.

or range of fees for specific types of services, provided disclosure is made of the variable and other pertinent factors affecting the amount of the fee specified."[11]

Since the advertising ban extends to the publication of truthful information, it may be justified only if the state has a valid interest in protecting the public from the danger that some people will unwittingly use the information to their detriment. This interest, however, rests on the same kind of paternalism that was criticized by the Court in *Virginia State Board of Pharmacy.* In that case, the Court admonished that a state's protectiveness of its citizens cannot rest solely on the "advantages of their being kept in ignorance." 425 U.S. at 769, 96 S.Ct. at 1829. It recognized that when "information is not in itself harmful, . . . people will perceive their own best interests if only they are well enough informed, and that the best means to that end is to open the channels of communication rather than to close them." 425 U.S. at 770, 96 S.Ct. at 1829.

Although certain kinds of advertising by physicians might be confusing to the public, we believe that the principles expressed in *Virginia State Board of Pharmacy* are applicable to the information to be included in the directory. We base this conclusion on the factual nature of the directory, the detailed explanation of the information in the introduction, the exclusion of any promotional statements, the opportunity of all physicians to be listed without charge, and the absence of any material that could be construed as soliciting patients.

In summary, then, we hold that § 54–317(13) abridges the plaintiffs' first amendment rights to gather, publish, and receive information about physicians' services in the manner proposed by the Agency through the publication of its directory. An appropriate injunction will be granted.

### Appendix A

The proposed introduction contains the following references to fees:

There are two payment plans you may encounter. Fee-for-service means that the patient is charged for the specific service rendered and must pay when the bill falls due. In a pre-payment plan, the patient pays a flat fee annually or monthly for a prescribed set of services. Some fee-for-service practices have flat fee arrangements for some services: for example, you may pay an obstetrician one fee for all care relating to prenatal care, labor and delivery. Some pre-paid group practice arrangements are called health maintenance organizations or HMO's. The HMO's in Northern Virginia, the Group Health Association (Annandale) and the Georgetown-Reston Community Health Plan, offer comprehensive health care for the entire family for fixed monthly premiums. Most physicians work on a fee-for-service basis.

. . . . .

Many doctors are generally available for phone consultations to their regular patients for follow-up care. Charges for phone consultations may be a way to discourage them. However, it may be worth it to some people to save a trip to the office.

. . . . .

*Fees and Billing*

Although the fee you will have to pay varies depending upon the amount of time the physician spends with you and how many laboratory tests are necessary, each physician's office has established fee schedules for different kinds of visits. The fee range listed under routine office visits may be considerably less than the fee for an initial visit, at which time the doctor may ask for detailed information on your history and do a complete physical examination.

It may assist you to plan better if you know a doctor's billing practices and what is expected of you. You should feel free to ask questions. Complaints and billing problems are handled differently in each doctor's office. You may find it

---

11. The statement of the Judicial Council is set forth in Appendix B.

useful to know whether you will talk with a secretary or bookkeeper about problems and under what circumstances the doctor will discuss fee problems with you.

Knowing whether or not a doctor accepts Medicaid or Medicare payments is essential to people enrolled in those plans. You may want to know, also, what insurance plans, such as Blue Cross/Blue Shield, the doctor bills directly for payment for services. This means that the doctor's office will do the insurance paper work for you.

### Appendix B

Statement of the Judicial Council [of the American Medical Association], Re: Advertising and Solicitation

This statement reaffirms the long-standing policy of the Judicial Council on advertising and solicitation by physicians. The *Principles of Medical Ethics* are intended to discourage abusive practices that exploit patients and the public and interfere with freedom in making an informed choice of physicians and free competition among physicians.

Advertising—The *Principles* do not proscribe advertising; they proscribe the solicitation of patients. Advertising means the action of making information or intention known to the public. The public is entitled to know the names of physicians, the type of their practices, the location of their offices, their office hours, and other useful information that will enable people to make a more informed choice of physician.

The physician may furnish this information through the accepted local media of advertising or communication, which are open to all physicians on like conditions. Office signs, professional cards, dignified announcements, telephone directory listings, and reputable directories are examples of acceptable media for making information available to the public.

A physician may give biographical and other relevant data for listing in a repu-

table directory. A directory is not reputable if its contents are false, misleading, or deceptive or if it is promoted through fraud or misrepresentation. If the physician, at his option, chooses to supply fee information, the published data may include his charge for a standard office visit or his fee or range of fees for specific types of services, provided disclosure is made of the variable and other pertinent factors affecting the amount of the fee specified. The published data may include other relevant facts about the physician, but false, misleading, or deceptive statements or claims should be avoided.

Local, state, or specialty medical associations, as autonomous organizations, may have ethical restrictions on advertising, solicitation of patients, or other professional conduct of physicians that exceed the *Principles of Medical Ethics*. Furthermore, specific legal restrictions on advertising or solicitation of patients exist in the medical licensure laws of at least 34 states. Other states provide regulation through statutory authority to impose penalties for unprofessional conduct.

Solicitation—The term "solicitation" in the *Principles* means the attempt to obtain patients by persuasion or influence, using statements or claims that (1) contain testimonials, (2) are intended or likely to create inflated or unjustified expectations of favorable results, (3) are self-laudatory and imply that the physician has skills superior to other physicians engaged in his field or specialty of practice, or (4) contain incorrect or incomplete facts, or representations or implications that are likely to cause the average person to misunderstand or be deceived.

Competition—Some competitive practices accepted in ordinary commercial and industrial enterprises—where profit-making is the primary objective—are inappropriate among physicians. Commercial enterprises, for example, are free to solicit business by paying commissions. They have no duty to lower prices to the poor. Commercial enterprises are generally free to engage in advertising "puffery," to be boldly self-laudatory in making

claims of superiority, and to emphasize favorable features without disclosing unfavorable information.

Physicians, by contrast, have an ethical duty to subordinate financial reward to social responsibility. A physician should not engage in practices for pecuniary gain that interfere with his medical judgment and skill or cause a deterioration of the quality of medical care. Ability to pay should be considered in reducing fees, and excessive fees are unethical.

Physicians should not pay commissions or rebates or give kickbacks for the referral of patients. Likewise, they should not make extravagant claims or proclaim extraordinary skills. Such practices, however common they may be in the commercial world, are unethical in the practice of medicine because they are injurious to the public.

Freedom of choice of physician and free competition among physicians are prerequisites of optimal medical care. The *Principles of Medical Ethics* are intended to curtail abusive practices that impinge on these freedoms and exploit patients and the public.

Journal of the American Medical Association, Vol. 235, No. 21, p. 2328, May 24, 1976.

WARRINER, District Judge (concurring):

Defendants, through the Assistant Attorney General of Virginia at the bar of this Court, acknowledged, in effect, that no substantial harm was envisioned if plaintiffs' prayer be granted. Under such circumstances there is scant basis for any balancing between plaintiffs' First Amendment rights and defendants' interest in regulating advertising by physicians. In the absence of any weighty countervailing factors, I concur with the opinion and join in the order entered by the Court.