Charles STEPHENSON et al., Appellants,

v.

The DURIRON COMPANY, Inc., Appellee.

Norman BAKKE et al., Appellants,

v.

The DURIRON COMPANY, Inc., Appellee.

No. 482.

Supreme Court of Alaska.

May 3, 1965.

John M. Savage, Clark & Savage, Anchorage, for appellants.

Robert C. Ely, Ely, Guess, Rudd & Havelock, Anchorage, P. Eugene Smith, Marshall & Smith, Dayton, Ohio, for appellee.

Before NESBETT, C. J., and DIMOND and AREND, JJ.

NESBETT, Chief Justice.

The single question before us is whether the appellee foreign corporation has transacted business in Alaska within the meaning of that term as defined by this court in Northern Supply, Inc. v. Curtiss-

Wright Corporation [1] and as defined by accepted authorities.

On March 16, 1962, the appellant Stephenson switched on a light in his apartment which set off an explosion of escaped gas. The apartment house burned to the ground. Appellants sued for personal injuries and property damage caused by the explosion and fire. The number of defendants was expanded until it included the supplier of the gas, the supervisors and contractors who installed the pipeline and the manufacturer of the allegedly defective valve.

This appeal concerns only the defendant The Duriron Company, Inc., manufacturer of the valve claimed to have permitted the gas leak which caused the explosion.

In Northern Supply, Inc. v. Curtiss-Wright Corporation we recognized that Alaska's corporation act was patterned after the Model Business Corporation Act and pointed out that AS 10.05.600 of Alaska's act, which names certain business activities that a foreign corporation may engage in without being considered to be transacting business in the state,[2] was intended to pertain only to the transaction of business as it relates to the power of the state to require the foreign corporation to obtain a certificate of authority. We emphasized

that AS 10.05.600 does not purport to define those activities which may subject a foreign corporation to the jurisdiction of Alaska's courts under the provisions of AS 10.05.642.[3] We said that a foreign corporation could very well be transacting business of such a nature that it was not required to obtain a certificate of authority under AS 10.05.600 but that the same business could be sufficient under AS 10.05.642 to subject the foreign corporation to the jurisdiction of Alaska's courts. We construed the words "transact business" in AS 10.05.642 as encompassing all those activities which would subject a foreign corporation to the jurisdiction of our courts when measured by the outer limits of the due process clause of the federal constitution.[4]

The facts must now be examined to determine whether The Duriron Company, Inc., had sufficient contact with Alaska so as to make it reasonable and just, according to the traditional conception of fair play and substantial justice that Alaska should exercise jurisdiction after service of process on the Commissioner of Commerce who in turn served appellant by mail, and force Duriron to defend against plaintiffs' claims for relief in Alaska's courts.

1. 397 P.2d 1013 (Alaska 1965).

2. AS 10.05.600 in pertinent part states: "Without excluding other activities which may not constitute transacting business in the state, a foreign corporation does not transact business in the state by carrying on any of the following activities: * * *
   "(5) effecting sales through independent contractors; * * *
   "(9) transacting business in interstate commerce;
   "(10) conducting an isolated transaction completed within a period of 30 days not in the course of a number of repeated transactions of like nature."

3. AS 10.05.642 states: "When a foreign corporation authorized to transact business in the state, or not authorized to transact business in the state but doing so, fails to appoint or maintain a registered agent in the

state, or when a registered agent cannot with reasonable diligence be found at the registered office, or when the certificate of authority of a foreign corporation is suspended or revoked, the commissioner is an agent upon whom process, notice, or demand may be served. Service on the commissioner shall be made by delivering to and leaving with him, or with a person designated by him in the corporation department of his office, duplicate copies of the process, notice, or demand. The commissioner shall immediately have one copy forwarded by registered or certified mail, addressed to the corporation at its principal office in the state or country under whose laws it is incorporated. Service on the commissioner is returnable in not less than 30 days."

4. Northern Supply, Inc. v. Curtiss-Wright Corporation, supra note 1, 397 P.2d at 1016–1017.

Duriron is a New York corporation with headquarters in Dayton, Ohio, and is engaged in the manufacture and sale of corrosion resistant iron alloy pipes and fittings. Duriron products are distributed throughout the United States by the use of district sales offices, manufacturer's representatives and plumbing jobbers. It is not authorized to transact business in Alaska and does not have and never has had a registered agent in the state for the receipt of service of process. No agent of Duriron has ever entered the Territory or State of Alaska to solicit and consummate the sale of any Duriron product.

Duriron's products found their way into Alaska in undetermined quantities by various methods. One effective method was through the efforts of Duriron's manufacturer's representative, John T. Doherty & Associates of Seattle. Doherty sent catalogs of Duriron products, printed by Duriron but stamped with Doherty's name, to engineers, architects and plumbers in Alaska. Doherty also sent quotations on any particular job to two Anchorage jobbers, Yukon Supply Company and Susitna Plumbing and Heating. Orders from these sources were sent to Doherty, who forwarded them to Duriron for approval. Upon acceptance a commission was paid to Doherty. Although subsequent in time to the facts which created the issue before us, it does appear from the record that since August of 1963 John Doherty Company has apparently followed the practice of sending a sales representative to Alaska to represent Doherty in selling Duriron products in Alaska.

The record reveals that on a number of occasions Delta Engineering Corporation of Houston, Texas, acting as an independent contractor, sent its purchase orders to salesmen of Duriron located in Houston, for products offered for sale by Duriron, for shipment to Delta in care of Anchorage Natural Gas Corporation, Anchorage, Alaska; that Duriron would ship the merchandise from Dayton, Ohio to Delta in accordance with instructions, and that payment would thereafter be made to Duriron by Delta.

Vinson Supply Company of Houston, Texas, acting as an independent contractor, on several occasions during 1960, 1961 and 1962, mailed written purchase orders from Houston to salesmen of Duriron also located in Houston, for Duriron products; that Duriron would ship the merchandise from Dayton to Delta Engineering Company in care of Anchorage Natural Gas Corporation, Anchorage, Alaska pursuant to instructions contained in the purchase orders and that the purchase price would thereafter be paid by check from Vinson to Duriron in Dayton.

In April of 1962 and again in March of 1963 Anchorage Natural Gas Corporation ordered merchandise from Duriron directly. These orders were accepted by Duriron. The merchandise was shipped to Anchorage Natural Gas Corporation at Anchorage and remittance was made by the gas corporation to Duriron at Dayton. On the other hand, Duriron refused to accept one order for merchandise mailed by Anchorage Natural Gas Corporation to Duriron in July of 1962.

Duriron summarizes those sales of its merchandise which are known to have reached Alaska in the years preceding the filing of this suit as follows:

In 1958 three Seattle companies purchased products from Duriron costing $5,602.84, and either shipped or caused Duriron to ship the products to a business in Alaska.

In 1959 four Seattle companies purchased products from Duriron costing $982.07, and either shipped or requested Duriron to ship the products to Alaska. In addition, in 1959, Duriron filled orders received directly from one Alaska company and a United States Air Force facility totaling $5,899.75.

In 1960, Seattle and Houston companies made purchases from Duriron totaling $14,717.49, and shipped or requested that Duriron ship the products to a business in Alaska. Also in 1960 one company and a

United States Air Force facility made purchases from Duriron totaling $529.32.

In 1961 Seattle, Tulsa and Houston companies made purchases from Duriron totaling $7,404.30, and shipped or requested Duriron to ship the products to Alaska.

In 1962 Houston and Seattle companies made purchases totaling $3,627.06 from Duriron, and shipped or requested that Duriron ship the products to a business in Alaska. Also, in 1962 Duriron filled one unsolicited order received direct from a company in Alaska totaling $630.64.

During the above years Duriron's total gross annual sales in all areas of the world varied between twelve and seventeen million dollars.

It seems agreed that the valve involved in this action arrived in Alaska after Delta Engineering Company, a Texas Corporation acting as agent for Anchorage Natural Gas Corporation, had ordered it along with other merchandise from Vinson Supply Company, also of Texas. Acting as an independent contractor, Vinson had ordered the valve from Duriron for resale. The invoices reveal that the products were to be sent by Duriron directly to Anchorage Natural Gas Corporation in Anchorage.

Since March of 1962 Duriron has maintained a branch office in Seattle, Washington, to serve a sales district covering several northwest states. This sales district was expanded to include Alaska on January 1, 1963.

On the basis of the foregoing facts the trial court found that Duriron did not have the necessary minimum contacts with the State of Alaska and that its courts could not exercise jurisdiction over the corporation. Duriron's motion to quash the summons was granted.

Since the decision of the United States Supreme Court in Pennoyer v. Neff,[5] the power of state courts to exert jurisdiction over foreign corporations has been steadily expanded by certain landmark decisions. These will be mentioned in the chronological order of their publication.

In International Shoe Co. v. State of Washington[6] a foreign corporate manufacturer of shoes employed salesmen resident in Washington to solicit orders there. Service of a notice of assessment for unpaid contributions to the state unemployment compensation fund was personally served upon one of the company's solicitors in Washington. A copy was also mailed to the company at its offices in Missouri. On special appearance the company argued that it was not doing business within the state and that it had no agent within the state upon whom service of process could be made. The court emphasized that the activities of the corporation in Washington were continuous and systematic and that its operations resulted in a large volume of interstate business. Also the company received the benefits and protection of the laws of the state, including the right to use its courts. Such operations were held to establish sufficient contacts with the state " * * * to make it reasonable and just according to our traditional conception of fair play and substantial justice to permit the state to enforce the obligations which appellant has incurred there."[7] The court found that its requirement that the method of service employed must give sufficient notice had been satisfied.

In Perkins v. Benguet Consolidated Mining Co.[8] the defendant Philippine corporation's gold and silver mining activities had been completely halted by the war. The president, who was also general manager and principal stockholder, maintained a corporation office in his home in Ohio from which he transacted corporate business with the assistance of two secretaries. Substantial corporate accounts were maintained in several Ohio banks, but none of the corpo-

5.   95 U.S. 714, 24 L.Ed. 565 (1878).

6.   326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

7.   Id. at 320, 66 S.Ct. at 160, 90 L.Ed. at 104.

8.   342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952).

rate business concerned any corporate properties in Ohio. The court held that under these facts federal due process would not be violated for Ohio either to take or decline jurisdiction of the corporation where the president had been personally served in Ohio in a suit against the corporation by a stockholder.

In McGee v. International Life Insurance Co.[9] deceased, a resident of California, had life insurance originally issued by mail by an Arizona company whose obligations had later been assumed by a Texas company. The beneficiary obtained a judgment on the policy in California and sued on the judgment in Texas. The Texas court refused to enforce the judgment on the ground that it was void under the Fourteenth Amendment because service of process outside California could not give jurisdiction to the courts of that state. The Supreme Court reversed the judgment of the Texas court and held that it was sufficient for the purposes of due process that the beneficiary's suit was based on a contract which had a substantial connection with California. Neither insurer had ever had an office or an agent in California, nor had either ever solicited any business in California, or for that matter done any insurance business in California with the exception of the policy there involved.

In Hanson v. Denckla [10] the United States Supreme Court commented on its previous decisions as follows:

"In McGee the Court noted the trend of expanding personal jurisdiction over nonresidents. As technological progress has increased the flow of commerce between States, the need for jurisdiction over nonresidents has undergone a similar increase. At the same time, progress in communications and transportation has made the defense of a suit in a foreign tribunal less burdensome. In response to these changes, the requirements for personal jurisdiction over non-residents have evolved from the rigid rule of Pennoyer v. Neff * * * to the flexible standard of International Shoe Co. v. State of Washington * * *. But it is a mistake to assume that this trend heralds the eventual demise of all restrictions on the personal jurisdiction of state courts. * * * Those restrictions are more than a guarantee of immunity from inconvenient or distant litigation. They are a consequence of territorial limitations on the power of the respective States. However minimal the burden of defending in a foreign tribunal, a defendant may not be called upon to do so unless he has had the 'minimal contacts' with that State that are a prerequisite to its exercise of power over him.".[11] [Citations omitted.]

The above mentioned decisions were ably reviewed in the recently decided case of Gray v. American Radiator and Standard Sanitary Corporation.[12] There an Illinois resident sued for injuries caused by a water heater explosion. A foreign corporation had manufactured the allegedly defective safety valve in Ohio. The valve was assembled into the water heater in Pennsylvania and the heater was eventually sold to the plaintiff consumer in Illinois.

An Illinois statute provided that any nonresident who, either in person or through an agent, committed a tort within the state was considered to have submitted himself to its jurisdiction and could be served personally outside the jurisdiction. The court held that the alleged negligence in manufacture of the valve could not be separated from the resulting injury and that the tort must be considered as having been committed in Illinois.

9. 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957).

10. 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958).

11. Id. at 250–251, 78 S.Ct. at 1238, 2 L.Ed. 2d at 1296.

12. 22 Ill.2d 432, 176 N.E.2d 761 (1961).

It then went on to consider the question of whether permitting service outside the state, where the defendant had no agent or employee in Illinois, and where the injury was his only contact with the state, exceeded the limits of due process. In deciding this question it was pointed out that the factor of whether or not the foreign corporation did a substantial volume of business in the state, relied on by the court in International Shoe had been minimized as a requirement by the later decision of the United States Supreme Court in McGee v. International Life Insurance Co.[13] Also, the record before the court did not disclose whether the foreign corporation had done any other business in Illinois.

It was held that the doing of a given volume of business was not the only way in which a nonresident could establish the "minimum contacts" with the state sufficient to support jurisdiction.[14]

In commenting on the lack of evidence of any previous volume of business the court said:

"* * * it is a reasonable inference that its commercial transactions, like those of other manufacturers, result in substantial use and consumption in this State. To the extent that its business may be directly affected by transactions occurring here it enjoys benefits from the laws of this State, and it has undoubtedly benefited, to a degree, from the protection which our law has given to the marketing of hot water heaters containing its valves. Where the alleged liability arises, as in this case, from the manufacture of products presumably sold in contemplation of use here, it should not matter that the purchase was made from an independent middleman or that someone other than the defendant shipped the product into this State.

"With the increasing specialization of commercial activity and the growing interdependence of business enterprises it is seldom that a manufacturer deals directly with consumers in other States. The fact that the benefit he derives from its laws is an indirect one, however, does not make it any the less essential to the conduct of his business; and it is not unreasonable, where a cause of action arises from alleged defects in his product, to say that the use of such products in the ordinary course of commerce is sufficient contact with this State to justify a requirement that he defend here." [15]

Although Duriron had no agent in Alaska, to its own knowledge for a number of years it had been satisfying practically every order directed to it from the Alaska market.[16]

■ When compared with Duriron's total gross sales of twelve to seventeen million dollars annually, its known sales of from four to fifteen thousand dollars an-

13. Supra note 9.

14. In addition to McGee v. International Life Insurance Co. the court relied upon Smyth v. Twin State Improvement Corp., 116 Vt. 569, 80 A.2d 664, 666, 25 A.L.R.2d 1193 (1951), where employees of a nonresident corporation engaged in re-roofing a building for a Vermont resident negligently damaged the building. Service of process was made on the Secretary of State who forwarded it by registered mail to the office of the Massachusetts corporation. The Supreme Court of Vermont held that due process had not been violated and that continuous activity within the state by the nonresident corporation was not a prerequisite to jurisdiction.

15. Gray v. American Radiator and Standard Sanitary Corp., supra note 12, 176 N.E.2d at 766.

16. The only known exception would be the refusal to accept the order mailed to Duriron by Anchorage Natural Gas Corporation in July of 1962, which was approximately four months after the explosion which resulted in this suit. As against this refusal, the record shows that Duriron did accept and fill orders submitted direct by Anchorage Natural Gas Corporation in April of 1962, one month following the explosion and again in March of 1963, one year after the explosion.

nually in Alaska might be argued not to be a "substantial volume" of business. On the other hand, when compared with the total market demands of a fledgling economy for specialized industrial products, it is quite likely that Duriron would be found to have been supplying a substantial portion of the total needs of the market, if all of the facts were known. In any event, we agree with Illinois' conclusion in Gray v. American Radiator and Standard Sanitary Corp., that the volume of business done in the state is not the only method by which the necessary contacts can be established.

In fact, if applied as a fixed test, the dollar volume of business done in the state as compared with the total dollar volume of business done in all areas, could result in a given nonresident corporation being held not to have transacted a sufficient percentage of its total business in the state to have established the minimum contacts, whereas another nonresident corporation with the same dollar volume of sales in the state but with a smaller total of gross sales in all areas, might be held to have established the minimum contacts based on the fact that a greater percentage of its total sales was transacted in the state.

It is not disputed that the flow of Duriron's products to Alaska was continuous from 1958 through 1962, the year in which this suit was commenced. The flow was not "systematic" in the same sense in which that term was used in International Shoe Co. to describe the efforts of resident Washington solicitors. Nevertheless, Duriron's response to all orders received, whatever the nature of their origin, seems to have been quite uniform. The orders were all "accepted" by Duriron [17] and shipped to Alaska by Duriron, either directly to the purchaser, or to the independent contractor-

purchaser in care of the ultimate purchaser, the consumer. Catalogs printed and distributed by Duriron for the use of and further distribution by manufacturer's representatives such as John T. Doherty & Associates generated much of Duriron's Alaska business. Duriron is presumed to have been aware of this.

Under these facts we hold that Duriron did derive a benefit from the laws of Alaska which provided a business climate and market demand for its industrial products and which were otherwise available to it for any purpose for which they might be required.

■ We hold, as did the Supreme Court of Illinois under similar facts [18] that the fact that some of the purchases were made from independent middlemen or that someone other than the manufacturer caused the product to be shipped into the state are not controlling factors.

The doctrine of "estimate of the inconveniences" which would result to the foreign corporation from a trial away from its home has been recognized as one of the tests relevant in determining whether due process would be violated by the exercise of local jurisdiction. [19]

In the case before us the allegedly defective valve manufactured by Duriron, was installed in the gas mains of Anchorage Natural Gas Corporation in Anchorage, Alaska. The explosion occurred at or very near the place of the installation. All of the other defendants, which includes the gas corporation, the contractor, subcontractor and supervisor are located in Anchorage. Most of the witnesses who would testify concerning the allegedly defective valve and its installation and operation with relation to a claimed lack of certain required couplings are located in this area.

17. The one exception being that mentioned in note 16 supra.

18. Gray v. American Radiator and Standard Sanitary Corp., 22 Ill.2d 432, 176 N.E.2d 761 (1961).

19. This doctrine was defined and applied by Judge Learned Hand in Hutchinson v. Chase & Gilbert, Inc., 45 F.2d 139, 141 (2d Cir. 1930) and approved in International Shoe Co. v. State of Washington, 326 U.S. 310, 317, 66 S.Ct. 154, 90 L.Ed. 95, 102 (1945), as one of the criteria for determining the question of due process.

It would appear to be far more convenient to Duriron to defend the suits in Alaska than to defend in Ohio and transport all of the witnesses to that state from Alaska. The convenience of the plaintiffs is likewise better served by trial in Alaska for the same reason.

We hold that the nature of the business transacted by Duriron in Alaska was such that the minimal contacts had been established. No violation of due process will result from requiring it to defend these suits.

The order of dismissal entered by the trial court is set aside and the case remanded for further proceedings consistent with the views expressed in this opinion.