**PORTLAND PARAMOUNT CORPORA-
TION, a corporation, Plaintiff,**

v.

**TWENTIETH CENTURY-FOX FILM
CORPORATION, a corporation, and
Elizabeth Taylor, Defendants.**

Civ. No. 65-313.

United States District Court
D. Oregon.

Aug. 9, 1966.

Clifford N. Carlsen, Jr., King, Miller,
Anderson, Nash & Yerke, Portland, Or.,
for plaintiff.

James J. Kennedy and Ryan & Ryan, Portland, Or., for defendant Twentieth Century-Fox Film Corporation.

Milton A. Rudin and Bruce M. Ramer, Gang, Tyre, Rudin & Brown, Los Angeles, and Clifford B. Alterman, Kell & Alterman, Portland, Or., for defendant Elizabeth Taylor.

## OPINION

KILKENNY, District Judge:

This cause is before the Court on the motion of the defendant Taylor challenging the jurisdiction of this Court over her by reason of the service of process under what is now called the Oregon "Long-Arm Statute," [1] as made applicable to the federal courts under Rule 4 (d) (7), (e) and (f), F.R.Civ.P. Four causes of action are alleged in the complaint:

(1) this cause charges in substance that Fox, by reason of certain warranties and representations to Paramount, which Fox knew to be false, and by assertedly concealing material facts so as to create a false impression and deceive Paramount, induced it, as a motion picture exhibitor, to enter into a contract with Fox, as a motion picture distributor, for the exhibition of "Cleopatra" and to pay Fox a non-returnable advance against film rentals as a result of which Paramount was damaged in the sum of $44,653.15,

(2) the second cause incorporates the contract mentioned in the first cause and charges that Taylor acted in the title role of "Cleopatra", which picture the plaintiff exhibited, and that during the negotiations leading up to, and at the time of the execution of, the exhibition contract and ever since, Taylor and Richard Burton knowingly, maliciously, negligently and otherwise so conducted themselves as to interfere with the property rights of Paramount, but that Fox, in breach of a duty to Paramount, did nothing to prevent such conduct until April 22, 1964, and that as a result thereof, Paramount was damaged in the same sum as mentioned in the first cause,

(3) the third cause alleges that Taylor had knowledge of the plaintiff's exhibition rights in "Cleopatra", the value of which depended upon "Cleopatra" attracting attendance, but that, nevertheless, Taylor individually and jointly with Richard Burton, knowingly, maliciously, negligently and otherwise so acted, and induced others to act, that the said conduct on the part of Taylor, individually and jointly with Burton, proximately interfered with and injured plaintiff's exhibition property rights and business interests with the result that attendance at the exhibition of the picture was substantially diminished and proceeds lost to the damage to Paramount in the same figure mentioned in the first and second causes of action,

(4) the fourth cause charges that Taylor and Fox entered into a written employment agreement, in connection with the employment of Taylor in the title role of "Cleopatra", and that certain provisions of the contract were intended for the direct benefit of Paramount to protect the value and integrity of the exhibition of "Cleopatra"; that Taylor rendered service under said contract and was compensated therefor and that Taylor willfully breached the terms of the contract to Paramount's damage in the same figure as set forth in each of the first three causes of action.

The record shows that personal service of the process was made on Taylor in the state of California. She does not challenge the method of service, nor does she claim that she was not properly notified of the pendency of the action. Simply stated, she claims that the statute under which the service was made does not and could not constitutionally apply to her situation.

Taylor is not now, and never has been, a citizen of Oregon, nor has she ever been in said state. A stipulation which was entered into and became part of the

1. ORS 14.035.

record, even casts some doubt on her citizenship.[2]

Fox and the producers of "Cleopatra", Twentieth Century-Fox Productions, Ltd. (hereinafter called "Productions") entered into a "Distribution Agreement" with a joint venture consisting of MCL Films, S.A. ("MCL", in which Taylor has an interest) and Walwa Films, S.A. ("Walwa") on August 24, 1960. It has been agreed, for purposes of this motion, that the acts of MCL may be treated as the acts of Taylor. A 1961 agreement provides that Productions, an English corporation wholly owned by Fox, would jointly produce "Cleopatra" with MCL and Walwa (Swiss corporations). A third agreement, in 1961, effected the loan by Fox of the services of Taylor and others to the joint venture comprised of Productions, MCL and Walwa. It seems fair enough to generalize that "the transactions were really only a complicated method by which Taylor and Fox entered into an agreement to produce and distribute 'Cleopatra', and share in the proceeds received from the exhibitors."

Taylor-MCL, apparently, have no voice in matters relating to the actual distribution of "Cleopatra", these being strictly under the control of Fox. The Distribution Agreement provides:

"Nothing herein contained shall in any wise constitute a partnership or joint venture between the Venture and Productions and the Distributor or be construed to evidence the intention of the Venture, Productions or the Distributor to constitute such. None of the parties shall hold itself out contrary to the terms of this Article, by advertising or otherwise, and none of the parties shall be or become liable or bound by any representations, act or omission whatsoever of any other party contrary to the provisions of this Article. Distributor agrees that it has no general or other authority to make or conclude contracts on behalf of the Venture or either corporation * * *." Section V, Art. 1.

and further:

"Nothing contained in this Agreement shall be deemed to impress a trust, express or implied, on any of the gross receipts or net profits from the Photoplay and all thereof may be fully comingled [sic] by the Distributor with its other funds in all countries and territories throughout the world, and the Distributor's sole obligation shall be to pay to the Venture and Productions such amounts as the Venture and Productions may become entitled to receive under this Agreement, computed as herein specified." Section V, Art. 12.

The warranties, on which plaintiff claims it relied, are as follows:

(a) That "Cleopatra" was a superior motion picture, the ultimate in motion picture making, and fully acceptable to the public;

(b) that defendant Elizabeth Taylor would perform her services with due diligence, care and attention, and that

2. "MR. RUDIN: * * * She signed what was a renunciation [of U.S. citizenship], but not in the form required by the State Department. She then took the position that she was no longer a citizen of this country. The State Department, the Government, has taken the opposite position, so she has been traveling on her American passport.

But I think for the purposes of this case it is sufficient—we would not want to get into this issue—we would stipulate for the purposes of this case that she is an American citizen, but not a resident or not a citizen of any of the states of the United States."

* * * * * * *
"MR. CARLSEN: [agreeing that the issue should not be pursued] * * * The only reason for it [the stipulation] was because some of these long-arm cases have been concerned with the convenience of the forum to the party. The only reason I wanted this in the record at all was to illustrate the fact that maybe Oregon is not the most convenient forum, but there isn't any other forum in the states that we can sue that would be any more convenient. * * *" (Bracketed material added.)

such acting performance was of the highest quality;

(c) that Richard Burton would perform his services with due diligence, care and attention, and that such acting performance was of the highest quality.

It is also charged in the complaint in the first cause, which is reincorporated in the other causes, that Taylor failed to make a full and complete disclosure to the plaintiff of the following facts which plaintiff is informed and believes are true:

(a) defendant Taylor was conspiring and inducing others to breach their agreement faithfully to perform their services in the production of "Cleopatra"; and

(b) that Richard Burton was conspiring with and inducing others to breach their agreements faithfully to perform their services in the production of "Cleopatra"; and

(c) that the screen play for "Cleopatra" was written during the filming of "Cleopatra" on virtually a day to day basis and not in advance of the filming of that motion picture.

Then defendant Taylor and Richard Burton are charged with jointly, knowingly, intentionally, willfully, maliciously and negligently interfering with the property rights and business interests of the plaintiff in "Cleopatra" as created by the Exhibition Agreement, all without justification and that said persons were acting, and each was inducing the other to act, in willful, wanton, malicious and negligent disregard of the property rights and business interests of the plaintiff by:

(1) their notorious and scandalous conduct with one another while, to public knowledge, each was married to another;

(2) holding themselves up to public opprobrium, ridicule and scorn;

(3) public statements made by defendant Elizabeth Taylor to the effect that "Cleopatra is of inferior quality"; and

(4) engaging in and each inducing the other to engage in the acts set forth in one, two and three, above mentioned, during the periods of production, distribution and exhibition of "Cleopatra", all of which activity was thereby associated with "Cleopatra" in the eyes of the public.

Plaintiff argues that Taylor's over-all conduct amounted to nothing less than:

(a) tortious acts "in Oregon—in that what she did in 'Cleopatra' and under circumstances whereby other communications media would be aware of her conduct, was bound to be displayed in or communicated widely in the state of Oregon." These alleged tortious acts would include her breaches of "warranty", and the

(b) transaction of business "in Oregon" since the film, in the profits of which she shared, must have been known by her to be scheduled for distribution in every state, including Oregon.

A number of cases have been decided by this Court construing the Oregon "long-arm" statute. In some of them, Hiersche v. Seamless Rubber Co., 225 F.Supp. 682 (D.Or.1963); Hicks v. Crane Co., 235 F.Supp. 609 (D.Or.1964); Rosenlund v. Transnational Ins. Co., 237 F.Supp. 599 (D.Or.1964), the defendant has been either physically present in person or by agent in the state. More closely in point is the decision in United Medical Laboratories, Inc. v. Columbia Broadcasting Co., Inc., 256 F.Supp. 570 (D.Or. 1966). There, Walter Cronkite, and others, who necessarily knew that the material would be broadcast in the state of Oregon, were held subject to the jurisdiction of this Court. Like the defendant Taylor, he never was in the state of Oregon, nor had he technically transacted any business within the state. My decision in *United Medical Laboratories* was grounded on the Court's construction of the Illinois statute in *Hiersche* and on Gray v. American Radiator & Std. Sanitary Corp., 22 Ill.2d 432, 176 N.E.2d 761 (1961), in which the Illinois court construes that state's statute, which is

the parent of the Oregon legislation. The controlling factor, in upholding Illinois jurisdiction in *Gray*, was the fact that the product had been manufactured for "ultimate use" in, among other places, the state of Illinois and, the fact that the manufacturer had thereby obtained benefits from the protection of the Illinois law. The same thing can be said of Taylor. She participated in the production of a film which was manufactured for ultimate use in all the states in the Union and, for that matter, throughout the western world. Furthermore, she anticipated profits from the exhibition of this picture in each of the states, including Oregon. Her profits from the film depended upon the profits of Fox and, therefore, she would, of necessity, be financially benefited from the exhibition of the picture in Oregon and would be protected by Oregon law to the same extent as Fox. The argument that there was no express undertaking in the contract which would control her conduct is tenuous in the extreme. By implication, if not otherwise, Taylor bound herself to see to it that her conduct was of such a nature so as not to destroy the value of the agreement. I need not decide whether a fiduciary relationship actually existed between Taylor and the plaintiff. She was legally bound to act for the benefit of the plaintiff in all matters pertaining to the contract. Hughes v. Helzer, 182 Or. 205, 224, 185 P.2d 537 (1947); Duniway v. Barton, 193 Or. 69, 78, 237 P.2d 930 (1951). In other words, Taylor, by her acceptance of a duty to perform under her contract, was then bound to exercise the utmost good faith and devoted service to those who were to contribute to her monetary fund and exhibit her pictures. This is a fundamental tenet of contract law. Dahl v. Crain, 193 Or. 207, 223, 237 P.2d 939 (1951) and John I. Haas, Inc. v. State Tax Comm'n, 227 Or. 170, 180, 361 P.2d 820 (1961). This rule applies to independent contractors where they undertake to perform the duty of loyalty. Marnon v. Vaughan Motor Co., Inc., 184

Or. 103, 172, 194 P.2d 992 (1948). The fact that the duty of good faith was not specifically mentioned in Taylor's agreements is of no particular significance. The duty was implied and inherent in the entire arrangement.

It would be fundamentally fair to require this defendant to respond to the process under the Oregon statute. It is my view that it would be her tortious conduct, rather than the "transaction of business", which would give the Oregon court jurisdiction. However, it would not be legalistically unsound to say that Taylor was transacting business in Oregon by reason of her third-party beneficiary interest in the employment and other agreements. Be that as it may, the complaint is sufficient to charge the defendant with deliberately giving a bad performance and inducing bad performances from others in a picture which she knew would be distributed in the state of Oregon and was probably under contract in the state. In the final analysis, Taylor's alleged conduct was such that she should be required to defend this action in the state of Oregon. Fundamental fairness requires that result. International Shoe Co. v. Washington, 326 U.S. 310, 315, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

I would deny the motion to dismiss, which I treat as a motion to quash. However, I would reserve ruling, until after pre-trial, on the legal questions raised as to the sufficiency of any one or more of the causes of action set forth in the complaint.

I remain of the view that the Oregon Supreme Court should have an opportunity to construe its own statutes. Therefore, on the authority of Blair v. People of State of California, 340 F.2d 741 (9th Cir. 1965); Louisiana Power & Light Co. v. City of Thibodaux, 360 U.S. 25, 79 S.Ct. 1070, 3 L.Ed.2d 1058 (1959); United Gas Pipe Line Co. v. Ideal Cement Co., 369 U.S. 134, 82 S.Ct. 676, 7 L.Ed.2d 623 (1962), and Harman v. Forssenius, 380 U.S. 528, 85 S.Ct. 1177, 14 L.Ed.2d 50 (1965), the proceedings before me in

this cause are stayed for a period of two weeks to afford the defendant, Elizabeth Taylor, an opportunity to apply to the Oregon courts for a determination of the legality of the service of process in this cause, under the Oregon Declaratory Judgments Act.[3] If defendant fails to seek such a determination in the Oregon courts within said period of time, plaintiff should so advise the Court and I shall enter an order denying the motion to quash the service on said defendant. If, within said period of time, defendant institutes the indicated proceeding and proceeds to prosecute the same to a final conclusion, the action here pending will be stayed during that period of time.

■ Since it is my opinion that a judgment of a circuit court of the state of Oregon, although persuasive, would not be controlling, I feel that a decision should be obtained from the Supreme Court of that state.

For the convenience of counsel, and, in order to expedite the proceedings in the state court, all material filed in this court in connection with the motion to quash, including the entire original file, if necessary, may be removed and temporarily used in the state court proceedings.

If the Oregon court prefers not to exercise its discretion and entertain jurisdiction under the indicated legislation, or otherwise, this fact may be brought to the attention of this Court by a proper showing, in which case, an order will be entered in conformity with the views previously expressed.

As an alternative to the state court proceedings, I would certify that this decision involves a controlling question of law as to which there is a substantial ground for difference of opinion, and an immediate appeal to the Court of Appeals may materially advance the ultimate termination of the litigation on the issues as to Miss Taylor. This statement is made pursuant to the provisions of 28 U.S.C. § 1292(b).