Elizabeth **TAYLOR**, Appellant,

v.

**PORTLAND PARAMOUNT CORPORATION**, Appellee.

No. 21334.

United States Court of Appeals
Ninth Circuit.

Sept. 12, 1967.

Rehearing Denied Oct. 19, 1967.

Bruce M. Ramer, Gang, Tyre, Rudin & Brown, Los Angeles, Cal., Kell & Alterman, Portland, Or., for appellant.

Clifford N. Carlsen, Jr., King, Miller, Anderson, Nash & Yerke, Portland, Or., for appellee.

Before POPE, JERTBERG and DUNIWAY, Circuit Judges.

DUNIWAY, Circuit Judge:

Taylor appeals under 28 U.S.C. § 1292 (b) from an order denying her motion to quash service of summons upon her. We reverse. The opinion of the District Court is reported in Portland Paramount Corp. v. Twentieth Century-Fox Film Corp., D.Or., 1966, 258 F.Supp. 962, and this opinion assumes that the reader is familiar with it.

Two questions are presented, both involving the Oregon "long arm" statute, ORS § 14.035, enacted in 1963. These are, whether Taylor's activities bring her within the terms of the statute, and whether, if they do, she is thereby deprived of due process as guaranteed by the Fourteenth Amendment to the Constitution of the United States, by being required to defend this action in Oregon.

The Oregon long arm statute provides, in pertinent part:

"Jurisdiction arising out of certain acts in this state.

(1) Any person * * * whether or not a citizen or a resident of this state, who, in person or through an agent, does any of the actions enumerated in this subsection, thereby submits such person * * * to the jurisdiction of the courts of this state, as to any cause of action or suit or proceeding arising from any of the following:

(a) The transaction of any business within this state;

(b) The commission of a tortious act within this state; * * *."

The trial court was of the opinion that the allegations of the complaint showed, on Taylor's part, the "commission of a tortious act within" Oregon. The court also thought that there was shown the "transaction of * * * business within" Oregon by Taylor, but did not base its decision on that ground. Here, appellee seeks to sustain the order on both grounds.

We first restate the facts, as we are not entirely satisfied with the trial court's statement of them. Taylor was served with process in California. She is not a resident or citizen of Oregon and has never been there. The case against her is stated in the third and fourth causes of action in the complaint. (The first two are against Fox [1] alone).

The third cause of action sounds in tort. The allegations are as follows: In 1960, Taylor and Fox entered into a joint venture to produce and distribute the proposed film "Cleopatra." Taylor was to and did play the title role, and one Richard Burton was to and did act in a co-starring role. Fox was to and did distribute the picture. Taylor was to receive a share of the receipts from distribution. Fox, in 1963, made a contract with appellee,[2] licensing the latter to show the picture, and received from appellee a non-returnable film rental of $175,000. As a result, appellee acquired valuable exhibition property rights in the picture. Taylor knew this, and knew that those rights directly depended on the success of the picture in attracting the public to see it. The complaint continues:

"IV

"Defendant Elizabeth Taylor is a well known motion picture actress, and at all times since she was engaged to appear in 'Cleopatra' has known that her acts, conduct and deportment have and do receive wide attention, notice, notoriety and publicity with the worldwide public in general and in particular with the worldwide motion picture going public, and that most especially her acts, conduct and deportment both during the filming of 'Cleopatra' and while it was being exhibited at theaters, in association with another member of the cast of 'Cleopatra', or in any other way associated with 'Cleopatra', would and did receive wide attention, notice, notoriety and publicity which is associated in the eyes of the

1. Twentieth Century-Fox Film Corporation.

2. Portland Paramount Corporation.

worldwide public and in particular with the worldwide motion picture going public, including the motion picture going public in the area of plaintiff's theatre, directly with 'Cleopatra.'

\* \* \* \* \* \*

### "VI

"Defendant Elizabeth Taylor, individually and jointly with Richard Burton, has, pursuant to, in furtherance of, and during the period of her joint venture or joint ventures and contract or contracts with defendant Fox, upon information and belief, knowingly, intentionally, willfully, maliciously and negligently, continuously since the early part of the year 1962 to the close of plaintiff's exhibition of 'Cleopatra,' interfered with and injured plaintiff's exhibition property rights and business interests, and the enjoyment of such rights and business interests, without justification and without serving any legitimate business interests, and has acted, and has induced Richard Burton to act, in willful, wanton, malicious and negligent disregard of the exhibition property rights and business interests of plaintiff by, among other things:

(a) Her notorious and scandalous conduct with Richard Burton while, to public knowledge, each was married to another.

(b) Holding herself up to public opprobrium, ridicule, and scorn.

(c) Public statements to the effect that 'Cleopatra' is of an inferior quality.

(d) Engaging in the acts set forth in subsections (a), (b) and (c) above and inducing Richard Burton to engage in the acts set forth in subsections (a) and (b) above during the periods of production, distribution and exhibition of 'Cleopatra,' all of which activity was thereby closely associated with 'Cleopatra' in the eyes of the public.

### "VII

"The acts of defendant Elizabeth Taylor, individually and jointly with Richard Burton, as set forth in paragraph VI above, have directly and proximately injured plaintiff's exhibition property rights and business interests in that the conduct of defendant Elizabeth Taylor and the notorious and adverse publicity resulting therefrom has been associated in the eyes of the public directly with 'Cleopatra,' with the result that attendance at the exhibition of 'Cleopatra' has substantially diminished, and proceeds that would have been realized by plaintiff but for the acts of defendant Elizabeth Taylor have been lost."

Damages are alleged to exceed $40,000.

The fourth cause of action sounds in contract. It repeats the same allegations as to the joint venture for production and distribution of the picture. It then alleges that the agreements made by Taylor and Fox were intended to be for the direct benefit of exhibitors, including appellee, and included provisions establishing (paragraph II):

"(a) The duty of defendant Elizabeth Taylor to abide by and observe reasonable and customary rules, directives, regulations and orders for her conduct and deportment during the course of the production of 'Cleopatra.'

(b) The duty of defendant Elizabeth Taylor to perform her services with due diligence, care and attention.

(c) The duty of defendant Elizabeth Taylor not to conspire with or induce others to breach their agreements faithfully to perform their services in the production of 'Cleopatra.'

(d) The duty of defendant Elizabeth Taylor to conduct and deport herself, both during and subsequent to the production of 'Cleopatra,' including the period of road show exhibition, in keeping with good taste and morals in order not to depreciate the commercial value of 'Cleopatra.' "

It is then alleged:

"Upon information and belief, defendant Elizabeth Taylor has willfully breached the express and implied terms, conditions, covenants and warranties of her joint venture or joint ventures and contract or contracts with defendant Fox as set out in paragraph II of this fourth cause of action."

In support of her motion to dismiss for lack of jurisdiction of her person, Taylor filed an affidavit, alleging that she is not a resident or citizen of Oregon, that she has never, in person or through an agent, transacted any business in Oregon, that she has never been in Oregon, and that she never, in person or by agent, entered into a joint venture contract to produce and distribute the picture "Cleopatra."

The actual contracts were also produced and received in evidence. This is what they show:

On August 11, 1960, Fox, by an elaborate written contract, employed Taylor to play the leading role in the projected film "Cleopatra." On August 24, 1960, three written contracts were made. Two Swiss corporations, MCL (which for the purpose of the motion is Taylor) and WAL WA, entered into a joint venture whereby they agreed to participate in producing the film. This joint venture was to terminate upon delivery of the photoplay to Fox. The agreement contemplated the making of the other two agreements. The second agreement of the same date (not in the record, but referred to in the documents) was between Productions (Fox's British subsidiary) [3] and the MCL–WALWA venture. It established a second joint venture between these three parties for the production of the film. This is shown by a later agreement between them of September 1, 1961, which is in the record and which supplements and modifies their August 24, 1960 agreement.

The third agreement of the same date, the distribution agreement, was between Fox, Productions and MCL–WALWA. By that agreement, Fox agreed to lend MCL–WALWA $2,500,000 to defray certain production costs, the loan to be secured by a note and a chattel mortgage of the photoplay, and to lend Productions sufficient additional moneys to produce the picture. Productions and MCL–WALWA granted to Fox "for all countries and territories throughout the world * * * the sole and exclusive right to print, reprint, publish, copy and/or vend the Photoplay * * * and to release, distribute, exhibit, sell, lease, rent, license, sublicense, reissue, exploit, advertise, and otherwise use and generally deal in and with the Photoplay. * * *" These rights, by additional provisions, were made as broad as the ingenuity of the draftsmen and a thesaurus could make them, and were to last for at least 14 years from the date of first public exhibition in the United States. Fox was "in no event * * * [to] incur any liability * * * based upon any claim * * * that * * * [it] has failed to realize receipts or revenues from the Photoplay which could or should have been realized." Productions and MCL–WALWA retained title to the Photoplay. Fox was to pay to MCL–WALWA 6⅔% of the first $7,500,000 of gross receipts, and 10% of any excess, with a minimum guaranty of $500,000, plus 10% of the net profits as defined. Further provisions are quoted in the opinion of the District Court. By letter agreement of September 19, 1960, Fox lent to the Productions—MCL–WALWA venture the services of Taylor and a number of other artists.

Over two and one-half years later, on April 3, 1963, production of a film apparently having been completed, Fox and

---

3. No claim is made that Products (Twentieth Century-Fox Productions Ltd.) was an alter ego of Fox.

appellee, Portland Paramount, made a written contract for the showing of "Cleopatra" at the Paramount Theatre, Portland, Oregon, beginning June 26, 1963, for a minimum run of 36 weeks. Fox received a minimum, non-returnable, guarantee of $175,000, and was to be paid certain percentages of the net box office receipts as defined in the agreement. This agreement gave Portland Paramount "a limited license to exhibit * * * 'Cleopatra' * * * at the Theatre * * * and * * * for no other purpose." It reserves to Fox some control of the manner of exhibition and considerable control of advertising. It contains no warranties by Fox.

■ We have described the contracts because appellee relies heavily upon its allegation that there was a joint venture between Fox and Taylor, and asserts that Fox made the agreement of June 26, 1963, with appellee on Taylor's behalf as well as for itself. It says that part of the negotiations for the contract between Fox and appellee, as well as its performance, occurred in Oregon. This, says appellee, was the transaction of business in Oregon, not only by Fox but also by Taylor, on whose behalf Fox was acting. Appellee urges that the trial court found that Fox and Taylor were joint venturers. We do not, however, so read the findings. The record would not support such a finding, if made.

■ Appellee filed no counter affidavits. It stands on the allegations of its complaint and on the facts shown by Taylor's affidavits and the contracts. The question is one of jurisdiction, and we think that we should apply the rules laid down in McNutt v. General Motors Acceptance Corp., 1936, 298 U.S. 178, 56 S.Ct. 780, 80 L.Ed. 1135, that the trial court is not bound by the pleadings (p. 184, 56 S.Ct. 780) and that the party asserting jurisdiction has the burden of establishing it if his allegations are challenged in any appropriate manner. (p. 189, 56 S.Ct. 780.) See also L. D. Reeder

Contractors of Arizona v. Higgins Industries, Inc., 9 Cir., 1959, 265 F.2d 768, 770. There certainly is such a challenge here. The motion was properly made under Rule 12(b) (2) of the Federal Rules of Civil Procedure, and such a motion can properly be supported by affidavit. (Rule 43(e)). We do not think that the mere allegations of the complaint, when contradicted by affidavits, are enough to confer personal jurisdiction of a nonresident defendant. In such a case, facts, not mere allegations, must be the touchstone. For example, if an accident occurred in California, we doubt that an Oregon plaintiff, merely by alleging that it occurred in Oregon, could give Oregon jurisdiction of a California defendant, in face of a showing that the accident in fact occurred in California.

Here, the actual contracts are in evidence and there is no evidence that they mean something other than what they say, much less that there was some other contract, oral or written, for a joint venture between Fox and Taylor. The contracts do not show a joint venture in the distribution of "Cleopatra." As the trial court said, Taylor had no voice in matters relating to its distribution, these being matters strictly under the control of Fox.

We now turn to the legal problems.

1. *The meaning of the statute.*

Appellee asserts, and the trial court held, that the pleadings show "the commission of tortious act within" Oregon. Appellee supports this holding on the theory that although Taylor's antics occurred elsewhere, it suffered damage from them in Oregon. This theory was accepted by the trial court. Appellee also asserts that Taylor, through Fox, engaged in the "transaction of * * * business" in Oregon.

The Oregon Supreme Court has not yet been called upon to construe the statute, but the United States District Court for Oregon has had to do so on several oc-

casions.[4] The statute appears to have been copied from that of Illinois,[5] and the District Court for Oregon has applied to it the rule that the legislature of Oregon, by copying the statute, adopted the construction given to it by the Illinois courts before its adoption by Oregon. Hiersche v. Seamless Rubber Co.; United Medical Laboratories v. Columbia Broadcasting System; Richey v. Sumoge; David v. London Shirt Company, all supra, n. 4. The District Court further held, in this case, that the Oregon courts would, applying Illinois decisions, uphold jurisdiction here (258 F.Supp. at 965–966). We accept, for the purpose of this case, the construction of the Oregon statute by the District Judge, who is an able and experienced Oregon lawyer. See People of State of California v. United States, 9 Cir., 1956, 235 F.2d 647, 654; Bellon v. Heinzig, 9 Cir., 1965, 347 F.2d 4, 6; Winston Research Corp. v. Minnesota Min. & Mfg. Co., 9 Cir., 1965, 350 F.2d 134, 142.[6] We do so primarily because the courts of various states, including Illinois, have construed their long arm statutes as going as far as the due process clause of the Fourteenth Amendment will let them go.[7] In effect, what these courts have done is to ab-

dicate their duty to construe the statutes of their own states and to turn it over to the Supreme Court of the United States, which is the ultimate interpreter of the Constitution of the United States. We have no present reason to doubt that the Oregon courts will do likewise. We think that it is probably true that the legislators of Oregon wanted to enlarge the jurisdiction of its courts over non-residents to the fullest extent that the Constitution permits. The attempt thus to expand jurisdiction is no new phenomenon; it has just been more successful in recent years.

2. *The question of due process.*

■ This is a federal question, and as to it we are controlled by decisions of the Supreme Court of the United States and by our own decisions. We need not here survey the history of the decisions of the Supreme Court that led to, or at least afforded the constitutional basis for, the adoption of long arm statutes by many states. That was done by this court in L. D. Reeder Contractors of Ariz. v. Higgins Industries, Inc., supra. We there attempted to distill from the decisions such minimum requirements of due process as remain, and adopted the summarization of them stated in 47 Georgetown L.J. 342,

4. Because a person served under the long arm statute will nearly always be a nonresident non-citizen of the state, it is more than likely that the action will be brought in the United States court or removed from the state court to the United States court as this case was. Thus, the statute is more likely to be construed by courts whose decisions on state law are not authoritative than by the Oregon Supreme Court. The reported decisions of the District Court construing the Oregon statute, other than the present case, are Hiersche v. Seamless Rubber Co., 1963, 225 F.Supp. 682; Hicks v. Crane Co., 1964, 235 F. Supp. 609; Rosenlund v. Transnational Ins. Co., 1964, 237 F.Supp. 599; Lamb v. Hussmann Refrigerator Co., 1966, 253 F.Supp. 280; United Medical Laboratories, Inc. v. Columbia Broadcasting System, Inc., 1966, 256 F.Supp. 570, dismissed, 258 F.Supp. 735; Richey v. Sumoge, 1966, 257 F.Supp. 32; David v. London Shirt Co., 1966, 259 F.Supp. 848.

5. Ill.Rev.Stat.1955, ch. 110, §§ 16–17.

6. We note, however, that in this case, as in several of the cases cited in note 4, supra, the District Judge had enough doubt about the proper construction of the statute to suggest to the parties that they seek a construction of it by the Oregon Supreme Court. So far, the invitation seems to have been declined, perhaps because, in each case, the District Judge ruled against the out of state defendants, and the latter might feel that they could hardly commence a suit for declaratory relief in the Oregon courts without thereby voluntarily submitting to their jurisdiction.

7. Gray v. American Radiator & Standard Sanitary Corp., 1961, 22 Ill.2d 432, 176 N.E.2d 761; Henry R. Jahn & Son v. Superior Court, etc., 1958, 49 Cal.2d 855, 858, 323 P.2d 437, 439; Mechanical Contractors Ass'n v. Mechanical Contractors Ass'n of N. Cal., 9 Cir., 1965, 342 F.2d 393, 399.

351–52 (1958). See 265 F.2d 774–775. We held that in that case the court lacked jurisdiction over a non-resident defendant corporation.

The first requirement is that the nonresident defendant must do some act or consummate some transaction within the forum. Personal presence, however, is not required. Thus, for example, use of the mails may suffice. McGee v. International Life Ins. Co., 1957, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223. The second requirement is that the claim must arise out of or result from the defendant's activities within the forum. The third requirement, which assumes that the first two are met, is that the assumption of jurisdiction must be consonant with the due process tenets of fair play and, substantial justice. We have applied these requirements, both to uphold jurisdiction, Mechanical Contractors Ass'n v. Mechanical Contractors Ass'n of N. Calif., supra, n. 7; and venue, Courtesy Chevrolet, Inc. v. Tennessee Walking Horse Breeders' and Exhibitors' Ass'n, 9 Cir., 1965, 344 F.2d 860, and to deny jurisdiction, Kourkene v. American BBR, Inc., 9 Cir., 1963, 313 F.2d 769; Dragor Shipping Corp. v. Union Tank Car Company, 9 Cir., 1966, 361 F.2d 43.

The most recent decision of the Supreme Court, relied upon by us in *Reeder*, emphasizes the continuing validity of the requirements of due process. In Hanson v. Denckla, 1958, 357 U.S. 235, 251, 253, 78 S.Ct. 1228, 1238, 2 L.Ed.2d 1283, the Chief Justice said:

"But it is a mistake to assume that this trend heralds the eventual demise of all restrictions on the personal jurisdiction of state courts. See Vanderbilt v. Vanderbilt, 354 U.S. 416, 418, [77 S.Ct. 1360, 1 L.Ed.2d 1456]. Those restrictions are more than a guarantee of immunity from inconvenient or distant litigation. They are a consequence of territorial limitations on the power of the respective States. However minimal the burden of defending in a foreign tribunal, a defendant may not be called upon to do so unless he has had the 'minimal contacts' with that State that are a prerequisite to its exercise of power over him. See International Shoe Co. v. [State of] Washington, 326 U.S. 310, 319 [66 S.Ct. 154, 90 L.Ed. 95] * * *.

"The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State. The application of that rule will vary with the quality and nature of the defendant's activity, but it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws. International Shoe Co. v. [State of] Washington, 326 U.S. 310, 319 [66 S.Ct. 154, 90 L.Ed. 95]."

We now return to the facts of this case. We consider first the theory that Taylor committed a tortious act in Oregon. If what Taylor is alleged to have done is a tort at all, a question that we need not now decide, we find it difficult to say that what plaintiff says she did was a "tortious act in" Oregon. The trial court thought it was, and, for the purpose of this case, we accept, albeit somewhat *dubitante*, see footnote 6, supra, its conclusion as to the meaning of the Oregon statute. But we think that the connection between her acts and Oregon is too remote to satisfy the requirements of due process.

In the first place, because Taylor had no contractual relationship with appellee, the cases cited by the trial judge, which deal with the duties of a party to a contract towards other parties to that contract or of an agent to his principal are

not apposite. In the second place, nowhere in the complaint does the appellee charge Taylor with breach of warranty; these charges are levelled at Fox alone; they are omitted from the cause of action pleaded against Taylor. The trial court's apparent reliance on them is misplaced.

The essence of the tort, then, is that an actress, who is one of the producers and owners of and plays a leading role in a motion picture, publicly misbehaved herself during and after its production in a manner that would cause a part of the public to decide not to see the picture.[8] In addition, she publicly disparaged it. She contracted with Fox to act in it; for which she was paid. She contracted with others to share in producing it. She borrowed money from Fox for the production. She contracted with Fox to distribute it. She knew that it would receive world wide distribution, and specifically, that it would be shown in Oregon. Her profit from production depended upon how well the public received it. The picture was not produced in Oregon. Her misconduct did not occur in Oregon. No contract to which she was a party was made in Oregon. She has never been there and has never done anything there. Only the distribution agreement contemplated any action in Oregon, and that was to be by Fox.

■ We cannot find here that Taylor, as distinguished from Fox, has done any act by which she purposefully availed herself of the privilege of conducting activities within Oregon, thus invoking the benefits and protection of its laws. (Hanson v. Denckla, supra, 357 U.S. at 253, 78 S.Ct. 1228). To say that she was doing so while disporting herself with Burton in various parts of Europe, merely because it was expected that Fox would contract for the showing of "Cleopatra" in Oregon, is to us to indulge in fiction. We do not think that the

Fourteenth Amendment permits a state to assert jurisdiction over a nonresident upon the basis of such a fiction.

If it be said that, through the mechanism of the distribution agreement, she sent the picture "Cleopatra" into Oregon, a position that we accept only *arguendo*, it is not that act which is the basis of the tort cause of action. Rather, it is her conduct elsewhere with Burton, and her disparagement of the picture, not in Oregon, that are claimed to be the tort.

Reliance is placed upon Gray v. American Radiator, supra, n. 7, which upheld service upon an out of state manufacturer and defined "tortious act" to include damage in the forum state resulting from a defect in a product manufactured and sold elsewhere but bought by an Illinois consumer from a party with whom the manufacturer had no relationship. *Gray* upholds application of the Illinois long arm statute to such a defendant in the face of claims of denial of due process. We express no opinion as to whether we would follow *Gray* in a case involving similar facts. We do not think that the facts here are similar. Here it is not some defect in the product (the picture), claimed to have been caused by Taylor, that is said to have damaged the rights that appellee says that it acquired under its contract with Fox. It is more as if the best known officer of a large automobile manufacturer, living in Detroit, were accused of personal misconduct in Detroit and of making disparaging remarks about his company's cars in Detroit, with the result that an Oregon dealer sold fewer cars than he otherwise might. This, we think, is not the kind of conduct that satisfies the requirement of doing some act in Oregon, nor do we think it consonant with the due process tenets of fair play and substantial justice that Taylor be required to defend such a charge in Oregon. See L. D. Reeder Con-

8. The complaint does not say how many people who might otherwise have stayed away were induced by Taylor's antics to see the picture. Who can say what the balance might be?

tractors of Ariz. v. Higgins Industries, Inc., supra; Magnaflux Corp. v. Foerster, N.D.Ill., 1963, 223 F.Supp. 522, at 564–565; Gypsy Pipeline Co. v. Ivanhoe Petroleum Corp., D.Colo., 1966, 256 F. Supp. 567.

In so holding, we have in mind, as did the Supreme Court of Illinois in *Gray*, supra, that:

"An orderly and fair administration of the law throughout the nation requires protection against being compelled to answer claims brought in distant States with which the defendant has little or no association and in which he would be faced with an undue burden or disadvantage in making his defense. It must be remembered that lawsuits can be brought on frivolous demands or groundless claims as well as on legitimate ones, and that procedural rules must be designed and appraised in the light of what is fair and just to both sides in the dispute. Interpretations of basic rights which consider only those of a claimant are not consonant with the fundamental requisite of due process." (176 N.E. 2d at 766.)

We think that these principles, in this case, support our view that, to require Taylor to defend this claim in Oregon would be to deprive her of due process. See also Erlanger Mills v. Cohoes Fibre Mills, Inc., 4 Cir., 1956, 239 F.2d 502; Conn v. Whitmore, 1959, 9 Utah 2d 250, 342 P.2d 871, 874–875.[9]

Nor does it matter that Taylor was served in the neighboring state of California, and that it is no great burden to require her to go from there to Oregon. As the Supreme Court said in Hanson v. Denckla, supra, the "restrictions on the personal jurisdiction of state courts * * * are more than a guarantee of immunity from inconvenient * * * litigation. They are a consequence of territorial limitations on the power of the respective States." (357 U.S. at 251, 78 S. Ct. at 1238) Moreover, the reach of the long arm statute purports to be worldwide. See Magnaflux Corp. v. Foerster, supra, where long arm service of Illinois process on a German citizen in Germany was upheld. We cannot properly hold that the relative length of the long arm is the determining factor in due process.

The other basis for asserting jurisdiction over Taylor—the transaction of business in Oregon—is even more tenuous. It is predicated upon the allegations in the fourth cause of action that we have set out above. The short answer is that the actual contracts are, in the record, and that they belie the allegations of the complaint. Taylor may well have owed the pleaded contractual duties to Fox or to Productions or to WALWA or to all three. But the production contracts are no more for the benefit of appellee than a subcontract with a manufacturer to make parts for a motor car would be for the benefit of one who might later buy the car from a dealer or distributor. The distribution agreement is no more for the benefit of appellee than a manufacturer's agreement with a distributor is for the benefit of the latter's customers. If Taylor can be said to have transacted any business in Oregon, it is only on the theory that, under the distribution agreement with Fox, she is to receive payments from Fox measured by a percentage of what Fox receives from exhibitors such as the plaintiff. This seems to have been the theory of the trial court. It is not the

---

9. We note that in *Conn* the Utah court declined to give full faith and credit to a judgment obtained in Illinois by an Illinois resident against a Utah resident. When viewed from the standpoint of the state into which it attempts to reach, the long arm has a much less attractive look to the court than when viewed from the standpoint of the reaching state. This may be why the Supreme Court, in Hanson v. Denckla, was at pains to point out that a minimum of due process is still required.

theory of the complaint. Moreover, under the distribution agreement the percentage is only a measure of what Fox is to pay. It gives Taylor no direct interest in any monies that Fox might receive from appellee. She could not assert any such claim against appellee. Assuming, as we do, that Oregon courts would construe so remote and tenuous a connection with Oregon as the transaction of business in Oregon, we think that the connection is so tenuous as to offend due process. See Kourkene v. American BBR, Inc., supra; Dragor Shipping Corp. v. Union Tank Car Co., supra.[10]

None of the cases cited by appellee goes as far as we would have to go here to uphold jurisdiction. Most of them, like *Gray*, involve injury to a forum state plaintiff by a defective product produced by the out of state defendants.[11] In some, an out of state defendant caused circulation, in the forum state, of a libel upon the resident plaintiff.[12] Others deal with contracts between forum state plaintiffs and out of state defendants.[13] We express no opinion as to whether we would follow any of them.

The order is reversed, with directions to grant Taylor's motion.

10. See also Kaye-Martin v. Brooks, 7 Cir., 1959, 267 F.2d 394, 397; Orton v. Woods Oil and Gas Co., 7 Cir., 1957, 249 F.2d 198, 202; Erlanger Mills v. Cohoes Fibre Mills, Inc., supra; Conn v. Whitmore, supra; Tyee Const. Co. v. Dulien Steel Products, Inc., 1963, 62 Wash.2d 106, 117, 381 P.2d 245, 252.

11. Stephenson v. Duriron Co., Alaska, 1965, 401 P.2d 423; Sheridan v. Cadet Chemical Corp., 1963, 25 Conn.Supp. 17, 195 A.2d 766; Keckler v. Brookwood Country Club, N.D., Ill., 1965, 248 F.Supp. 645; Anderson v. Penncraft Tool Co., N.D., Ill., 1961, 200 F.Supp. 145; McMahon v. Boeing Airplane Co., N.D., Ill., 1961, 199 F.Supp. 908; Tice v. Wilmington Chem. Corp., Iowa, 1966, 141 N.W.2d 616; Anderson v. National Presto Industries, Inc., 1965, 257 Iowa 911, 135 N.W.2d 639; Ehlers v. United States Heating & Cooling Mfg. Corp., 1963, 267 Minn. 56, 124 N.W.2d 824; Metal-Matic, Inc. v. Eighth Judicial District Court, Nev.1966, 415 P.2d 617; Hoagland v. Springer, 1962, 75 N.J. Super. 560, 183 A.2d 678; Fornabaio v. Swissair Transport Co. Ltd., Sup.Ct., 1964, 42 Misc.2d 182, 247 N.Y.S.2d 203; David v. London Shirt Co., D.Or., supra, n. 4; Richey v. Sumoge, D.Or., supra, n. 4; Jackson v. National Linen Service Corp., W.D.Va., 1965, 248 F.Supp. 962; Nixon v. Cohn, 1963, 62 Wash. 2d 987, 385 P.2d 305; cf. Phillips v. Anchor Hocking Glass Corp., 1966, 100 Ariz. 251, 413 P.2d 732; O'Brien v.

Comstock Foods, Inc., 1963, 123 Vt. 461, 194 A.2d 568; Hodge v. Sands Mfg. Co., W.Va., 1966, 150 S.E.2d 793. But see Velandra v. Regie Nationale des Usines Renault, 6 Cir., 1964, 336 F.2d 292; Trippe Mfg. Co. v. Spencer Gifts, Inc., 7 Cir., 1959, 270 F.2d 821; Hardy v. Bankers Life & Cas. Co., 1958, 19 Ill.App.2d 75, 153 N.E.2d 269; Feathers v. McLucas, 1965, 15 N.Y.2d 443, 261 N.Y.S.2d 8, 209 N.E.2d 68; Schroeder v. Loomis, Sup.Ct., 46 Misc.2d 184, 259 N.Y.S.2d 42.

12. Bibie v. T.D. Publishing Corp., N.D. Cal., 1966, 252 F.Supp. 185; Roy v. North American Newspaper Alliance, Inc., 1964, 106 N.H. 92, 205 A.2d 844; United Medical Laboratories, Inc. v. Columbia Broadcasting System, Inc., D. Or., supra, n. 4. But see Insull v. New York World Telegram Corp., 7 Cir., 1959, 273 F.2d 166; Putnam v. Triangle Publications, Inc., 1957, 245 N.C. 432, 96 S.E.2d 445.

13. Liquid Carriers Corp. v. American Marine Corp., 2 Cir., 1967, 375 F.2d 951; Melfi v. Goodman, 1962, 69 N.M. 488, 368 P.2d 582; Simms v. Hobbs, Okl., 1966, 411 P.2d 503; Sun-X Glass Tinting of Mid-Wisconsin, Inc. v. Sun-X International, Inc., W.D.Wis., 1964, 227 F.Supp. 365. But see Grobark v. Addo Machine Co., 1959, 16 Ill.2d 426, 158 N.E. 2d 73; Saletko v. Willys Motors, Inc., 1962, 36 Ill.App.2d 7, 183 N.E.2d 569.