**Police Officer Michael R. BOLLINE**

v.

**The CITY OF NEW ORLEANS.**

**The POLICE ASSOCIATION OF NEW ORLEANS, et al.,**

v.

**The CITY OF NEW ORLEANS.**

**Civ. A. No. 90–5015, 91–525.**

United States District Court, E.D. Louisiana.

Feb. 20, 1991.

---

Dale Charles Wilks, Dale C. Wilks, Frank Gerald Desalvo, David C. Rash, Law Office of Frank G. Desalvo, New Orleans, La., for Police Ass'n of New Orleans, Ronald J. Cannatella, Frank Vacarella and Michael Conn.

Elmer Grant Gibbons, III, Kathy L. Torregano, Jay Alan Ginsberg, City Atty.'s Office, and William David Aaron, Jr., New Orleans, La., for City of New Orleans.

Vernon Palmer, Tulane Law School, New Orleans, La., Sidney M. Bach, Gerald D. Wasserman, Bach & Wasserman, Metairie, La., for Michael R. Bolline.

## ORDER AND REASONS

FELDMAN, District Judge.

Notwithstanding the assertion of grave federal constitutional issues in these consolidated cases, this Court must presently abstain from speaking to those issues because substantial state constitutional law issues are at the center of this controversy and resolution of the state law issues by the Louisiana state courts could moot or substantially alter the federal issues before this Court. The assertion of the federal power should await the effort of the state courts to resolve the state issues which drive and might resolve this dispute.

### I

#### A.

The history of this case begins with the passage, on August 13, 1973, by the Council of the City of New Orleans, of Ordinance No. 5240. It established a residence test of employment for personnel of the City.

The 1973 ordinance preferred residents of Orleans Parish in initial employment opportunities with the City, and required all employees of the City to reside in Orleans Parish. Employees already employed by the City who resided in other parishes could only move to another location within their parish of residence or to Orleans Parish. Some exemptions were permitted on an individual basis. Because the City was not able to meet its staffing needs exclusively from residents within Orleans Parish, many city employees who were hired after the adoption of the 1973 ordinance got an exemption. Although the ordinance was controversial, the City fathers and employees enjoyed a period of uneasy truce ... until recently. On December 6, 1990, the City adopted still another ordinance: Municipal Ordinance No. 14268 added a new provision to Chapter 2 of the City Code entitled the "City Domicile Ordinance." Ordinance 14268 requires all officers and employees of the City to be "domiciled" within the Parish of Orleans by January 1, 1994. The Ordinance became effective on December 10, 1990. It has opened old wounds, tensions and fears.

The Ordinance's definition of "domicile" limits city employees in a far stricter manner than the residence requirement of the 1973 ordinance. According to Ordinance 14268, "domicile" means the "principal resi-

dential establishment in which an officer or employee makes his or her habitual residence."

## B.

The plaintiffs' problems with Ordinance 14268 stem primarily from the definition of domicile accorded to those employees who have more than one residence. If someone owns and occupies a residence in Orleans Parish and also in another parish, the individual's "domicile" is defined as that in the parish where the property value of the residence is greatest, where he or she claims a homestead exemption, or is registered to vote. The Ordinance also instructs that those who now live outside Orleans Parish must move to Orleans Parish only, if they wish to change locations. In short, the City wants its workers to live in New Orleans as well as work there.

The penalties for violating Ordinance 14268 are severe. Those who knowingly violate it may be dismissed. Further, any officer or employee who knowingly permits someone to commence, continue or resume employment while not domiciled in New Orleans, or any employee who establishes his domicile elsewhere or fails to maintain a New Orleans domicile, or any person who knowingly makes false representations to the Department of Civil Service or anyone connected to the enforcement of the Ordinance, is made guilty of a misdemeanor, and, if convicted, may be fined up to $300, or imprisoned for up to five months, or both.

The Ordinance contains a transitional grandfather clause. Anyone who is not in violation of the 1973 ordinance, but who now is domiciled outside of New Orleans, has until 1994 to comply with the new Ordinance (except those who live outside Orleans Parish and wish to move).

The City says it needs Ordinance 14268 because it became apparent in recent years that, despite the 1973 ordinance, many present city employees established multiple residences both within New Orleans and outside. It is the City's stated fundamental belief that those city workers who are paid with tax dollars generated by the citizens of New Orleans should similarly support its tax base, and that city employees should be part of the community they serve in order to understand and identify with its problems.[1]

## II

### A.

The procedural structure of this case is complicated and, for purposes of defendant's abstention motion, needs discussion. On December 24, 1990, Police Officer Michael Bolline filed a class suit in this Court to have Ordinance 14268 declared unconstitutional and, in the alternative, if the Ordinance is found to be a valid exercise of the City's legislative power, to have the plaintiffs' class compensated for full future earnings or property interests if they have to sell their offending property.

Bolline sued on behalf of 509 classified civil service employees who have previously applied for and received authorization from the City to live outside the City and who established their residence outside New Orleans in compliance with the 1973 ordinance. Bolline assails Ordinance 14268 on a variety of federal constitutional fronts.

Before Bolline sued, the New Orleans Firefighters Local 632, AFL–CIO of New Orleans filed suit December 7, 1990 in the Civil District Court for the Parish of Orleans, No. 90–23634 "E", seeking a declaratory judgment that the new Ordinance is unconstitutional under Article 10, Section 10 of the Louisiana Constitution. The firefighters suit, also known as the Sanchez suit, challenges the new Ordinance on strictly state constitutional law grounds.

---

**1.** The Council itself found that the morale and efficiency of the city civil service, the strength of the city's economy, and the city's tax base would be enhanced and protected by increasing the number of City officers and employees that are domiciled in the City and who therefore have a stronger and more direct interest and a greater stake in the City's general welfare and in the quality of life enjoyed by those who live there. Only Aviation Board members escape the reach of the new law.

The City went ahead with its plans to enforce Ordinance 14268.

On January 23, 1991, the Chief Administrative Officer of the City issued Circular Memorandum No. 7–91 with a Certification of Domicile/Residence Form attached; the circular's purpose was to determine the residence and domicile of all city employees. Its issuance was not unexpected after passage of Ordinance 14268. It directs all departments, boards, agencies and commissions of the City to distribute the domicile/residence certification sheets to each city employee and order them to complete the form. The certification form asks the employees about the dates and locations of where they live and property they own. The circular states that all employees must complete the papers by February 15, 1991 (this deadline was abrogated by the Court's temporary restraining order). Any employee who fails, refuses or is unable to complete the papers must be reported to the Chief Administrative Officer.

The circular is far-reaching; it carefully enumerates penalties for failure to complete the forms or for the falsification of information, including disciplinary action and termination of employment, fine and imprisonment under the new Ordinance.

### B.

On January 31, 1991, still another federal suit attacking the Ordinance was filed, by the Police Association of New Orleans and certain police officers individually and on behalf of all civil service employees of the City. (The Bolline and PANO cases have been consolidated. Bolline and PANO make essentially the same federal constitutional attack. And PANO makes essentially the same challenge on state law grounds as does the Sanchez suit.)

The PANO plaintiffs initially sought a temporary restraining order to enjoin the City from requiring employees to fill out the circular form. They also seek declara-

tory relief that Ordinance 14268 is unconstitutional, and a preliminary and permanent injunction enjoining the City of New Orleans from implementing or enforcing the provisions of the Ordinance.

The federal suit plaintiffs assert that the Ordinance violates both the United States and Louisiana constitutions. They urge: that the Ordinance is an ex post facto law, is an unlawful interference with the obligation of contracts in violation of Article 1, Section 10 of the United States Constitution, violates the due process and equal protection rights guaranteed by the Fourteenth Amendment, and violates the freedom of association guaranteed by the First Amendment. They add that the Ordinance interferes with their civil rights as protected by Section 1983 of the Civil Rights Act.

Significantly, plaintiffs also strenuously assert, by way of PANO's suit, a number of state law infirmities. As do the Sanchez plaintiffs, the federal plaintiffs center their attack on the claim that the Ordinance violates Article 10, Section 10 of the Louisiana Constitution of 1974, which vests exclusive jurisdiction in the Civil Service Commission for the City of New Orleans to adopt and promulgate rules regarding the administration and regulation of employment in the civil service, employees like the plaintiffs in both the federal and state suits. The plaintiffs also underscore that the City defined "domicile" in a way that conflicts with the definition given in Louisiana Civil Code Article 38, thus acting in violation of their enumerated powers under the Home Rule Charter provision, Article 6, Section 5(E) of the Louisiana Constitution of 1974.[2]

The City has filed a Motion to Abstain asking this Court to abstain from deciding the merits of the federal constitutional issues. The presence of serious state issues requires that they first be resolved in the state court system to avoid "needless friction with state policies" and to give "scrupulous regard for the rightful independence of state governments." *Railroad*

---

**2.** Plaintiffs also claim that the Ordinance interferes with their state constitutional rights to due process, to equal protection, to acquire, own, control, use, enjoy, protect and dispose of private property, to vote, to be free from ex post

facto laws and to be free from laws impairing the obligation of contracts. *See* La. Const. of 1974, Article 1, Sections 2, 3, 4, 10, and 23, respectively.

*Com. of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 645, 85 L.Ed. 971 (1941).

### III

#### A.

■ Much has been written by federal courts on the merits of abstention. This comity-based doctrine implicates a discretion to be exercised under limited circumstances, only after the most careful scrutiny by the abstaining court. Because of the delays inherent in the abstention process and the danger that valuable federal rights might be lost in the absence of expeditious adjudication in the federal court, abstention ought be invoked only in special circumstances. *Harris County Commissioners Court v. Moore*, 420 U.S. 77, 95 S.Ct. 870, 875, 43 L.Ed.2d 32 (1975). Nevertheless, the federal doctrine of abstention takes form because of our fundamental notions of the structure of our government. Thus, one of these special circumstances is triggered when a state court interpretation of a state law at issue would render unnecessary or substantially modify the federal constitutional question. *Harman v. Forssenius*, 380 U.S. 528, 85 S.Ct. 1177, 1182, 14 L.Ed.2d 50 (1965).

■ Abstention under such special circumstances is anchored by the need to recognize and enhance principles of federalism by avoiding premature federal constitutional adjudication, interference with important state functions, and decisions on questions of state law better solved by state courts. *O'Hair v. White*, 675 F.2d 680, 693 n. 28 (5 Cir.1982), citing *Harman v. Forssenius*, 85 S.Ct. at 1181. It teaches caution on the part of federal courts, if the dispute can be resolved within the state system itself. As the Supreme Court recommended in the well-known case of *Railroad Com. of Texas v. Pullman Co., supra*, when a federal constitutional claim is premised on an unsettled question of state law, the federal court should stay its hand in order to provide the state courts the first opportunity to settle the underlying state law question and thus avoid the possibility of unnecessarily injecting a federal constitutional pronouncement.

#### B.

The values of federalism spotlighted by the Supreme Court in *Pullman*, and repeated often by later courts, are undisputedly at stake here. *Pullman* announced three threshold factors a district court should consider when deciding whether or not to abstain: 1) whether the federal disposition of a question of state law can eliminate or narrow the scope of the federal constitutional issue; 2) whether the state law question presents difficult, obscure or unclear issues of state law; and 3) whether a federal decision could later conflict with subsequent state court decisions concerning the same regulatory program or scheme, thus engendering more confusion. *High Ol' Times, Inc. v. Busbee*, 621 F.2d 135, 139 (1980), citing *Pullman, supra*.[3]

■ This Court is keenly aware that abstention is the exception, not the rule, and should be applied only when the court is convinced that at least one of the *Pullman* factors is present. *Id.* The answer in the present setting is clear: the first *Pullman* factor—whether the disposition of a question of state law can eliminate or narrow the scope of the federal constitutional issue—is decisive. *Pullman* also instructs how unwise it would be for a federal court "to decide an issue by making a tentative answer which may be displaced tomorrow by a state adjudication." *Pullman*, 61 S.Ct. at 645.

The *Pullman* doctrine, although arguably stern, is crucial to the integrity and strength of our federalist system. As Justice Frankfurter admonished, "substantial constitutional issues should be adjudicated only when no alternatives are open." *Burford v. Sun Oil Co.*, 319 U.S. 315, 338, 63 S.Ct. 1098, 1110, 87 L.Ed. 1424 (Frankfurt-

---

3. It does not appear to matter if the ordinance at issue is passed by a city and not a state, as long as the legislation is being challenged under state law. *See Gray Line Motor Tours, Inc. v. New Orleans*, 498 F.2d 293 (5 Cir.1974) (federal court correctly abstained to allow state court to determine whether a requirement passed by the New Orleans Aviation Board violates state law).

er, J., dissenting). Abstention here, for the time being, will avoid an unnecessary determination of federal rights and eliminates the potential for conflicting decisions from state and federal courts.

In this Court the plaintiffs have raised state constitutional issues which a state court could decide in such a way as to moot or substantially alter the federal issues before this Court.[4] Some of those very same issues are at stake in the Sanchez suit in state court.

Both this Court and the state court are confronted with claims that the Ordinance offends a panoply of rights enumerated in the Louisiana Constitution of 1974. Some of these rights mirror those rights protected by the United States Constitution. They include the right to due process, to equal protection, to vote, to be free from ex post facto laws, and to be free from laws impairing the obligation of contracts. The presence of these state claims does not compel *Pullman* abstention, but it is clearly supportive. More importantly, the Court is greatly concerned with the state-unique claim that the Ordinance violates Article 10, Section 10 of the Louisiana Constitution of 1974, which vests exclusive jurisdiction in the Civil Service Commission for the City of New Orleans to adopt and promulgate rules regarding the administration and regulation of employment in the classified city civil service.[5] This issue, the extent of the Commission's power to the exclusion of others, is uniquely a state issue, one which could necessarily end the dispute without federal intervention. It is strikingly similar to the issue in *Pullman.*

The Sanchez case is primarily grounded on the theme that the Ordinance violates Article 10, Section 10 of the state constitution. The state court has before it not only the exact state constitutional issue that is also pending before this Court, but the potentially singular dispositive issue. If the state court rules that the City Council violated Article 10, Section 10, the Ordinance falls by the weight of state constitutional infirmity and the issues before this Court would become moot, or, at the very least, substantially altered. In the words of the Supreme Court "the nub of the whole controversy may be the state constitution". *Harris County Commissioners Court v. Moore,* 95 S.Ct. at 876, citing *Reetz v. Bozanich,* 397 U.S. 82, 90 S.Ct. 788, 790, 25 L.Ed.2d 68 (1970).

### C.

The assertion of state claims is not enough. This Court must also inquire into the apparent merits of the state law claims (without trying to predict or suggest the result). If they are baseless, abstention becomes a hollow credo. "Unless the state law in question", the Fifth Circuit says, "is fairly susceptible of an interpretation that might avoid or substantially modify the federal constitutional question, federal courts should exercise their properly invoked jurisdiction." *O'Hair v. White,* 675 F.2d at 693, citing *Kusper v. Pontikes,* 414 U.S. 51, 94 S.Ct. 303, 306, 38 L.Ed.2d 260 (1973).

Plaintiffs strenuously claim that the City Council does not have the constitutional authority in this State to make a classified civil service employee's domicile a lawful cause for removal or for serious disciplinary action in the form of a fine or prison sentence. Only the Civil Service Commission, they say, has the special and exclusive constitutional prerogative to make rules for the administration and regulation of the merit system of the classified civil service.

---

**4.** The doctrine has been invoked to allow state courts to interpret both state constitutional provisions and state statutes. *O'Hair v. White,* 675 F.2d at 692 n. 27. The Court does not forecast or speculate on how the state law issues will or should be decided.

**5.** Article 10, Section 10(A)(1) gives the Commission exclusive authority to:

"adopt rules for regulating employment, promotion, demotion, suspension, reduction in pay, removal, certification, qualifications, political activities, employment conditions, compensation and disbursements to employees, and other personnel matters and transactions; to require an appointing authority to institute an employee training and safety program; and generally to accomplish the objectives and purposes of the merit system of Civil Service as herein established."

*New Orleans, Etc. v. Civil Service, Etc.,*
422 So.2d 402, 409 (La.1982).

The state constitution does not specifically address residence or domicile in this context; however, a real question is at issue as to whether the Council has in effect appropriated to itself regulation of the hiring, firing and disciplining of classified employees, and has thus transcended the construct of Article 10, Section 10.

For example, state doctrine seems to reveal that each local civil service commission is an autonomous body with identified duties; the merit system they administer is self-operative and established under the state constitution; their constitutionally delineated powers and duties are above change or modification by the Legislature; and their powers and duties are exclusive. *Civil Service Commission v. Guste,* 428 So.2d 457, 462 (La.1983). Presumably, because the Commission has exclusive authority to hear and decide all removal and disciplinary cases, (La. Const. Art. 10, § 12), it would be responsible, in part, for administering the Ordinance.

The fundamental purpose of the state civil service administrative model is to establish a merit system for selecting certain public employees on the basis of merit, and to insure that they can be discharged only for insubordination, incompetence, or improper conduct. *Guste,* 428 So.2d at 462. Without anticipating its merits, it seems as though a respectable argument can be made that the City Council might have entered an area that belongs to the Commission.

On an equally serious note, it is urged that the Commission has preempted the Council. The Commission, for example, has promulgated rules for applicants to original employment and promotional examination. Rule V, §§ 2.1 and 2.4 of the Commission Rules provide:

2.1 Applicants for all original entrance examinations must be residents of the City of New Orleans unless this requirement is specifically waived on the announcement.

2.4 The Director shall fix requirements of training, residency, age, health, skill, education or other qualifications for admission to examinations. Such qualifications must be possessed by any applicant by the final filing date for each examination unless otherwise specified in the official announcement.

And so, the dispute about Article 10, Section 10 of the 1974 Louisiana Constitution and its resolution could possibly eliminate or modify the federal constitutional questions; this state law question is both difficult and unclear; this Court cannot forecast its outcome. *See Busbee, supra.*

### D.

Other serious and unclear state law issues also thread their way through these cases. The plaintiffs point out that the City Council does not have the authority to define "domicile" contrary to Article 38 of the Louisiana Civil Code; by doing so, the argument goes, they have acted in violation of their defined powers under Article 6, Section 5(E) of the Louisiana Constitution.[6]

Article 38 defines "domicile" as "the parish wherein he has his principal establishment ... The principal establishment is that in which he makes his habitual residence ..." Under Article 38, an individual's intention to make a parish his domicile is the key element in determining domiciliary status. Intent may be proved by such things as a written declaration or by the surrounding circumstances. *Wilson v. Butler,* 513 So.2d 304, 306 (La.App. 1st Cir.1987).

But the Ordinance defines "domicile" more strictly. Unlike the Code's definition, the Ordinance provides that if one has more than one residence, intention has no bearing on which residence is one's domicile. Instead, the Ordinance mandates an

**6.** This and other state constitutional claims are not specifically addressed by the Sanchez plaintiffs in state court. However, the lack of a pending state proceeding does not mandate federal adjudication, although such a situation may

increase the costs of delay. *Duncan v. Poythress,* 657 F.2d 691, 697 (5 Cir.1981). Whether or not a state suit is pending constitutes just another factor federal courts take into consideration.

automatic domicile in the parish where the property value of the residence is greatest, where one claims a homestead exemption, or where one is registered to vote.

The Louisiana Constitution of 1974, Article 6, Section 5(E), states:

> A home rule charter ... shall provide the structure and organization, powers, and functions of the government of the local governmental subdivision, which may include the exercise of any power and performance of any function necessary, requisite or proper for the management of its affairs *not denied by general law or inconsistent with this constitution.* (emphasis added).

The City Council has arguably defined domicile in a way that is inconsistent with the general law given by the Louisiana Civil Code. The state court might choose to decide this difficult and obscure question, and others which have been raised in the Sanchez suit.

### IV

It is now clear that serious state law issues are spotlighted by the disputed Ordinance, here and in state court. They might have merit; they are susceptible to an interpretation by the state court that would moot or substantially limit the federal questions before this Court today. They must be resolved by the state court, not this Court. The *Pullman* doctrine obliges this Court to abstain until the state court speaks (which this Court assumes will not involve unreasonable delay; otherwise, this Court will no doubt once again be asked to resolve the federal constitutional claims).

█ Abstention merely defers for now this Court's exercise of its adjudicatory powers. The case literature repeatedly reminds us that abstention does not involve the abdication of jurisdiction, but merely the postponement of its exercise. *Gray Line Motor Tours, Inc. v. City of New Orleans,* 498 F.2d 293, 298 (5 Cir.1974). Thus this Court retains jurisdiction of these consolidated cases pending final and expeditious resolution of the state law issues in the state court system.[7] *See Romero v. Coldwell,* 455 F.2d 1163, 1166 (5 Cir.1972).

The Court cannot ignore the distinct responsibility of the state court system to resolve the substantial and dominant state constitutional issues without the intervention of this Court until, if appropriate, after those issues have been decided. To do otherwise would represent a presumptuous exercise of federal power.

Defendant's Motion to Abstain is GRANTED. These consolidated cases are stayed and closed pending final resolution of the state law issues in the state court system, to be reopened if necessary upon motion by any party. The Court's previously entered Temporary Restraining Order is hereby dissolved. Each party shall bear their own costs.

---

7. The *Pullman* doctrine does not require a litigant referred to state court to present his federal claims there: he may reserve such claims for federal court disposition, if need be. *Nissan Motor Corp. In U.S.A. v. Harding,* 739 F.2d 1005, 1011 (5 Cir.1984).